**FEDERAL TRADE COMMISSION,**
Plaintiff,

v.

**ALLIANT TECHSYSTEMS INC., Defendant,**

**and**

**Olin Corporation, Intervenor–Defendant.**

**Civ. A. No. 92–2499–LFO.**

United States District Court,
District of Columbia.

Nov. 18, 1992.

Supplemental Memorandum Nov. 23, 1992.

[redacted] 

[redacted]

---

Mary Lou Steptoe, Deputy Director, Bureau of Competition, Steven A. Newborn, Director for Litigation, Ann Malester, Assistant Director, Laura A. Wilkinson, Diana Dietrich, Elizabeth A. Jex, Michael R. Moiseyev, Carey Piercey, Melissa K. Heydenreich, Steven K. Bernstein, David J. Dadoun, Washington, DC, for plaintiff.

Virginia L. Snider, Washington, DC, Director for Sp. Projects.

Robert Pickett, Sylvia M. Brooks, Research Analysts, Washington, DC.

Ira S. Sacks, Fried, Frank, Harris, Shriver & Jacobson, New York City, William A. Davis, Fried, Frank, Harris, Shriver & Jacobson, Washington, DC (Eric H. Queen, and Jeanne Samuels, of counsel), for defendant Alliant Techsystems Inc.

James R. Loftis, III, William A. Henry, Bernard A. Nigro, Jr., Elise Kirban, Collier, Shannon, Rill & Scott, Washington, DC (E. McIntosh Cover, Robert J. Tubbs, Law Department, Olin Corp., Stamford, CT, of counsel), for Olin Corp.

MEMORANDUM

OBERDORFER, District Judge.

Plaintiff has demonstrated a substantial likelihood of success on the merits before the Federal Trade Commission. The record in this case, necessarily developed hurriedly and informally,[1] yields some provable facts and considerable speculation about the future course of world events, business judgments, and a variety of other unprovable contingencies.

The relevant proven facts are essentially as follows. The United States Army is the sole domestic customer for 120 millimeter tank ammunition. The United States constitutes the geographic market. For the purposes of this case, there are four varieties of the product currently under production: 120 millimeter CE and KE training rounds and 120 millimeter CE and KE tactical rounds. All current tactical and training rounds are manufactured for, and sold to, the Army by the two defendant firms, Alliant Techsystems Inc. and Olin Corporation. In addition to the current rounds, advanced KE tactical rounds are being developed for the Army exclusively by Olin. Advanced CE tactical rounds are being developed for the Army exclusively by Alliant. Collectively, the products and services involved in the manufacture of the current 120mm rounds and in the development of the advanced tactical rounds constitute the relevant product market. *See e.g., Brown Shoe Co. v. United States,* 370 U.S. 294, 325, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1962). Between the two companies, defendants share a complete monopoly over the relevant market.[2]

[redacted] The Army has decided, for reasons of its own, that after fiscal year 1993, it will buy all 120 millimeter tank ammunition from one manufacturer. It was prepared to downselect this surviving firm through a "winner-take-all" competitive bid for a five-year contract for the procurement of training ammunition. In anticipation of that competition, Alliant and Olin agreed to merge all of their 120 millimeter ammunition manufacturing and development systems into a single entity. If the merger were consummated, there would be no competition between Alliant and Olin for the five-year contract for training ammunition.

1. The motion for a temporary restraining order was filed on November 6, 1992 to bar a merger scheduled after midnight that date. The merger now is scheduled to occur after midnight, November 24, 1992.

2. The Herfindahl–Hirschman Index is 10,000.

Moreover, the resulting entity would have a complete monopoly over the relevant domestic market for all training and tactical 120 millimeter tank ammunition. This showing, in itself, is adequate for plaintiff to demonstrate a substantial likelihood that the merger will "substantially ... lessen competition or ... tend to create a monopoly," as prohibited by § 7 of the Clayton Act.

Defendants have presented testimony that suggests the Army supports the merger and that the acquisition is, therefore, in the public interest. The defendants called as witnesses Stephen K. Conver, Assistant Secretary of the Army for Research, Development, and Acquisition, and Colonel Franklin Y. Hartline, Program Manager, Tank Main Armament Systems at the U.S. Army Armament Research, Development and Engineering Center at Picatinny Arsenal. Both witnesses indicated a professional and individual preference for the merger and sole source procurement of the five-year contract over a competitive bid. Colonel Hartline, however, testified that "the Army's ... policy is it has no objection to the merger, it's not for it or against it." P.I. Tr. at 133. Conver, the officer authorized to represent the official Army position, testified that the Army "has no objection to the proposed merger," and "take[s] no official position concerning the antitrust implications of this transaction." Conver Declaration, Def. Ex. 7 ¶ 2.

It remains theoretically and legally possible that if the non-competitive sole source bid is too high, the Army could manufacture one or all of the varieties of the product with its own resources. It is also theoretically possible that another private source might appear. However, Alliant and Olin are well-qualified to produce all the varieties of the product. Both companies are involved in the production of all current training and tactical rounds. Alliant, in addition, helped develop both types of advanced tactical rounds. Entry into the market by either the Army or a new private source likely would be more costly and time consuming than would the development and production by either Alliant or Olin of the rounds presently contracted

from the other. Thus, if the monopoly created by the merger abuses its power, it is not likely to be broken by a new entry or restrained by a threat thereof.

■ The public interest in market competition for a product paid for directly by the taxpayers and protection of the product against monopoly power is manifest and is defined by Congress in the Clayton Act, as amended, 15 U.S.C. § 12 *et seq.*, and the Competition in Contracting Act. 10 U.S.C. § 2301 et seq. This public interest would be best served if the merger did not occur.

■ Overhanging the conventional public interest considerations is the possible risk in this case that a national emergency could find the Army short of advanced 120 millimeter tactical ammunition. There is evidence that the merged companies may require less time to fulfill the requirements of the new contract than would the survivor of a competition between Alliant and Olin. An unforeseen emergency could develop in that window of time. The Army, however, has not intervened directly or through the Department of Justice to oppose this merger for this or any other reason. The Army's official position is unconcern. With all respect for the two conscientious and impressive Army witnesses who testified on behalf of the defendants, their testimony regarding risk was too muted and speculative to overcome the critical fact that the Army as an institution does not recommend the merger or seek to bar the injunction of it.

There is a "presumption in favor of a preliminary injunction when the Commission establishes a strong likelihood of success on the merits." *F.T.C. v. PPG Industries,* 798 F.2d 1500, 1507 (D.C.Cir.1986). Defendants' invocation of the public interest in avoiding risk has failed to overcome that presumption here.

For the foregoing reasons, and for additional reasons to be stated in a Supplemental Memorandum, an accompanying Order will enjoin the merger and order expedited

adjudication of the merits by the Commission.[3]

## ORDER

Plaintiff, the Federal Trade Commission, moves pursuant to § 13(b) of the Federal Trade Commission Act, 15 U.S.C. § 53(b), for an injunction against the acquisition by defendant Alliant Techsystems Inc. of any voting securities, assets, or any other interest, directly or indirectly, in Olin Corporation pending decision by the Commission on the question of whether the acquisition is unlawful. The parties have filed and the Court has considered extensive briefs and exhibits in support of, and in opposition to, the motion. At a hearing on November 16, 1992, defendants adduced oral testimony and counsel for both parties made oral arguments. For reasons stated in an accompanying Memorandum and in a Supplemental Memorandum to be filed, it is this 18th day of November, 1992, at 3:00 p.m., E.S.T., hereby

ORDERED: that plaintiff's motion for preliminary injunctive relief should be, and is hereby, GRANTED; and it is further

ORDERED: that defendant Alliant Techsystems Inc. is hereby ENJOINED, pursuant to section 13(b) of the Federal Trade Commission Act, 15 U.S.C. § 53(b), from acquiring any voting securities, assets, or any other interest, directly or indirectly, in Olin Corporation; and it is further

ORDERED: that defendant Alliant Techsystems Inc. shall take any and all necessary steps to prevent any of its domestic or foreign agents, divisions, subsidiaries, affiliates, partnerships, or joint ventures from making such acquisition; and it is further

ORDERED: that on or before November 20, 1992, defendant Alliant Techsystems Inc. and intervenor-defendant Olin Corporation shall show cause, if any there be, why each should not return all confidential information received directly or indirectly from the other and destroy all notes relating to such information; and it is further

ORDERED: that Alliant Techsystems Inc. and Olin Corporation shall, in the foregoing, and all other, respects, maintain the status quo pending the issuance of an administrative complaint by the Commission and until such complaint is dismissed by the Commission or set aside on review or until the order of the Commission made thereon has become final; and it is further

ORDERED: that the Commission shall expedite action on the matter before it; and it is further

ORDERED: that, on or before 4:30 p.m., November 19, 1992, any party may file any motion relating to the sealing of pleadings, exhibits or transcripts which the party deems to be indicated.

## SUPPLEMENTAL MEMORANDUM

Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), seeks a preliminary injunction pursuant to § 13(b) of the Federal Trade Commission Act, 15 U.S.C. § 53(b), to enjoin a pending merger between defendants, two defense contractors. Plaintiff alleges that the proposed merger, which will create a monopoly in the production of 120mm tank ammunition, violates § 7 of the Clayton Act, as amended, 15 U.S.C. § 18. Because plaintiff has demonstrated a likelihood that the merger will "substantially ... lessen competition or ... tend to create a monopoly," *id.*, and because defendants have not demonstrated a threat to the national security that would override the public interest in promoting competition, plaintiff's motion for a preliminary injunction was granted on November 18, 1992, for reasons stated in an accompanying Memorandum and in a Supplemental Memorandum to be filed. This is that Supplemental Memorandum.

## I. FINDINGS OF FACT

The Federal Trade Commission is an administrative agency of the United States organized and existing pursuant to the Federal Trade Commission Act, 15 U.S.C. § 41 *et seq.* ("FTC Act"). The Commission

---

**3.** At the preliminary injunction hearing, plaintiff's counsel represented that ordinary adjudication of the merits, including review before the

Court of Appeals, would take two to eight years. Expedited adjudication and review can be completed within two years.

is responsible, *inter alia*, for enforcing federal antitrust laws, particularly § 7 of the Clayton Act, and §§ 5 and 13(b) of the FTC Act.

Defendants are two private corporations which provide defense products by contract to the U.S. government. Defendant Alliant Techsystems Inc. ("Alliant"), designs, researches, develops, and manufactures various defense products, and renders related services, which it sells to the United States and foreign governments. Alliant is a pure defense company, with over 90 percent of its sales made to the United States Army ("the Army"). Defendant Olin Corporation ("Olin") manufactures chemicals and metals, and provides defense-related products and services.

Both Olin and Alliant supply ammunition to the Army in large quantities. In particular, both serve as "systems prime contractors" supplying 120mm tank ammunition for M1A1 and M1A2 Abrams battle tanks. Systems prime contractors work with the Army to design and engineer a product to meet Army specifications, coordinate the production of various component parts by systems subcontractors in bulk quantities, and provide engineering, research and development, and quality assurance. The systems prime contractor is responsible for ensuring that the rounds ordered by the government are produced on schedule, on budget, and within specifications. The systems contractor owns the product and assumes the risk of failure until the Army certifies the product and title passes. *See* Olin Contract, Def. Ex. 108.

120mm tank ammunition falls into two main categories: kinetic energy ("KE") rounds; and high explosive anti-tank ("HEAT") or chemical energy ("CE") rounds. Each of these categories of ammunition is manufactured in both training rounds, for practice, and advanced tactical or combat rounds. Thus, a total of four types of rounds constitute the current 120mm ammunition family: the KE advanced tactical (M829A2) and training (M865) rounds, and the CE advanced tactical (M830A) and training (M831) rounds.

Alliant and Olin are the exclusive systems contractors for all rounds of 120mm ammunition. The two are responsible for roughly equivalent proportions of the total Army procurement, and together, they enjoy a monopoly over the development, manufacture, and sale of 120mm rounds. Alliant and Olin each produce both CE and KE training rounds, and both companies produced the previous generation of KE and CE tactical rounds.[1]

The Army, however, contracted with only one company ("sole sourced") for each type of the advanced tactical rounds. Thus, Alliant is the exclusive systems contractor for advanced CE rounds, and Olin is the exclusive systems contractor for advanced KE rounds. Olin played no role in the development of the advanced CE round, although it produced the previous CE tactical rounds and produces CE training rounds. Transcript of Preliminary Injunction Hearing, November 16, 1992 ("P.I.Tr.") at 26. Alliant participated in developing the advanced KE round until Olin obtained the sole source contract in 1991. P.I.Tr. at 24. Both of these advanced tactical rounds presently are in low-rate initial production.

The advanced tactical rounds feature critical technological advances over the previous generation. The main difference in Olin's advanced KE tactical round is a "sabot," produced at Olin's Flinchbaugh facility. The primary technological developments in Alliant's advanced CE tactical round are a fuse, produced under subcontract by Bulova Technologies, Inc. ("Bulova"), and a semismart sensor, produced under subcontract by the Motorola Corporation ("Motorola"). In addition, the advanced CE rounds are loaded, assembled, and packaged by Mason & Hanger–Silas Mason Co., Inc. ("Mason & Hanger"). P.I.Tr. at 24–28.

With the exception of the Olin-manufactured sabot, therefore, the technologies and specialized components critical to the ad-

---

1. The advanced KE and CE tactical rounds at issue in this case replaced a previous generation of KE (M829A1) and CE (M830) tactical rounds, no longer in production. Both Olin and Alliant were systems contractors for this previous generation of KE and CE tactical rounds.

vanced rounds are produced by subcontractors. Alliant does not produce any components for the advanced CE tactical rounds, but contracts out the engineering and production responsibilities to subcontractors. P.I.Tr. at 28. Each of the critical subcontractors has declared that it would be willing to provide its services and products to either Olin or Alliant. Pl.Ex. 209 ¶ 4; Pl. Ex. 210 ¶ 5; Pl.Ex. 205 ¶¶ 25, 28.

Due to shrinking military budgets [2] and a projected decline in demand in the post-Cold War era, the Army determined in 1991 that it could no longer support two systems prime contractors for production of 120mm ammunition. Consolidation would reduce duplication of costly production overheads. The Army accordingly decided to reduce the number of systems prime contractors to one by 1994.

The Army has several possible routes for designating a single producer for 120mm rounds. First, the Army could "breakout" the production from the systems contractors and oversee subcontractors' production of the 120mm rounds itself. The Army has overseen production directly in this manner for other defense products, such as the M910A5 ammunition round. P.I.Tr. at 30. This option would require hiring as many as 300 additional Army personnel to manage the subcontractors, however. Def. Ex. 53 ¶ 13. Thus, though theoretically feasible, under the present growing constraints on the military budget, Colonel Franklin Y. Hartline has testified that a breakout would be "risky" and "difficult." P.I.Tr. at 30.

In its Acquisition Strategy Report, finalized October 1992, the Army predicted that "the quality, reliability, performance and timely delivery of this 120mm tank ammunition could be severely jeopardized" under a breakout, and that "in-house resources are not sufficient/available to support the additional testing, quality assurance or procurement requirements" that would be required. Pl.Ex. 31 at 12. Alliant has as-

sessed the probability of a future breakout at zero percent. Pl.Ex. 126.

As an alternative to a breakout, the Army could downselect to a single 120mm supplier through a winner-take-all bid. The Army originally intended to hold a competitive bid for the 1994–1998 contract for training rounds. Following this downselect, the Army no longer would hold competitive bids for 120mm ammunition, but would sole source the munitions from a single supplier. The winner of the 1994 training bid thus would receive the sole training ammunition contract for the five year period, as well as become the sole systems contractor for the development, production, and sale to the Army of all 120mm rounds, both tactical and training, for the life of the program. As the sole United States producer, the winner also would gain a strong position (shared by the Germans) in an increasingly important foreign market.

After the Army announced its intention to sole source 120mm ammunition, Alliant and Olin entered discussions regarding a merger of their 120mm operations. In the proposed agreement entered on August 4, 1992, Olin agreed to exchange its Physics International subsidiary and its Ordnance Division for approximately 2.82 million shares of newly issued Alliant common stock (valued at $62.39 million) and the assumption by Alliant of approximately $65 million of Olin debt. Following the issuance of the common stock, Olin will hold about 22 percent of Alliant's outstanding stock.

Should the parties enter the merger, they would preclude the Army from conducting a competitive bid for the 1994 training contract. Alliant, together with the merged Olin divisions, instead would enjoy monopoly leverage in negotiating a sole source contract for that product, as well as acquire a monopoly over all other 120mm rounds.

The merged Alliant would have a 100 percent share of the relevant 120mm mar-

---

**2.** The Army ammunition procurement budget was cut by 50 percent in the fiscal years 1991 to

1993, from $14 to $7 billion. Def.Ex. 7 ¶ 3.

kets, with a Herfindahl–Hirschmann Index of the maximum 10,000 points. The parties intended to consummate the merger sometime after midnight, November 24, 1992, if it were not enjoined.

Both the merger and the competitive bid options for downselecting to a sole supplier bring unique benefits and costs. Louis A. Guth, an economic consultant and witness for defendants, argues the merger will save the Army $10 million in duplicate overhead costs, since the Army would not have to maintain two systems contractors in fiscal 1993. Def.Ex. 1 at 24(a). However, Jimmy C. Morgan, an Army procurement officer and witness for defendants, estimates that maintaining dual source overheads in fiscal 1993 would cost approximately $3 to $4 million. Pl.Ex. 212 at 118. Defendants also argue that intangible benefits in quality and efficiency would accrue from a merger of the best elements of both company's personnel and facilities.

The merger option also has its costs. Neither party disputes that a competitive bid would result in lower prices for the 1994 training ammunition contract than the letting of the contract to the single source the merger would create. Because sole source contractors lack competitors, and because their profits are based on a percentage of costs, they have few incentives to lower costs. Pl.Ex. 203 at 7. There is persuasive opinion in the record that Army oversight, while effective, is an imperfect substitute for the action of the competitive market. Pl.Ex. 211 ¶ 18; Pl.Ex. 205 ¶ 34; Pl.Ex. 204 ¶ 6; Pl.Ex. 6 ¶ 9; Furthermore, as indicated above, the prospect of an Army breakout is too remote to discipline the merged entity's price demand.

On the other hand, a competitive bid in the present context could result in unusually large cost savings, since the parties would be bidding not only for a five year contract, but for a future monopoly in all four 120mm rounds and a strong position in foreign markets. William Rogerson, Professor of Economics at Northwestern University, has declared that even a below cost bid might be a rational investment choice in order to ensure obtaining the sole source systems contract. Pl.Ex. 201 ¶¶ 5, 13. *But compare* Def.Ex. 20.

Accepting that a competitive bid would result in a lower price for the 1994–98 contract, the only dispute here is the relative size of the discount a competitive bid would produce over a merger, and whether that competitive benefit would be offset by other hidden costs. Plaintiff estimates the contract price produced by a competitive bid might be as much as 23 percent less than the price without competition, a difference in cost to the Army between 42.7 and $115 million. Pl.Ex. 201 ¶ 12; Pl.Ex. 1; Pl.Ex. 213. Plaintiff also notes that Olin requested a premium in exchange for entering the merger. Guth, on the other hand, estimates that competition would lower the contract price by "no more than five to ten percent," Def.Ex. 1 at ¶ 22, or $25 to $50 million. Morgan has declared the Army expects Alliant's prices to rise three to ten percent after a merger, and is willing to pay up to 12 percent without reservation. Pl.Ex. 4 at 18.

On the other hand, a competitive bid would impose other efficiency costs and possible risks. Estimated duplicate overhead costs for fiscal 1993 are discussed above. Most other costs are attributable to the fact that neither Alliant nor Olin now produces the advanced tactical round made by the other. To hold a competitive bid, therefore, the Army would have to make each company knowledgeable enough to bid intelligently for the other's advanced tactical round. Defendants estimate this cost at $4 to $6 million, with a possible production delay of 12 to 14 months. Def. Ex. 57; Def.Ex. 5 ¶ 12. Morgan also expressed concern that participants in a competitive bid might stint on service quality in order to cut cost and win the contract. Def.Ex. 9 ¶ 25.

Other intangible difficulties might arise from the transfer of technology, adding further costs and delays. For example, Steven K. Conver, the Assistant Secretary of the Army for Research, Development and Acquisition, speaking on behalf of the Department of Defense ("DoD") and the Army, has declared that in the absence of

the merger, a winner-take-all competition could leave the victor in a weakened position to execute the contract, that the losing company's technical and manufacturing capabilities could be lost, and that the surviving company might not be able to build the products to the Army's requisite quality, time schedule, and cost specifications. Def.Ex. 7; *see also* Def.Ex. 53 ¶ 14(c).

The cost of a technology transfer would be highest if Olin won the bid, since Olin has no experience with the advanced CE round, and because the advanced CE round uses semi-smart technology. Def.Ex. 53 at 10. Edwin H. Schmidt, Group Vice President of defense systems for Alliant, estimates that the transfer of technology to Olin would exceed $3 million, and that in a competition, Olin would add an additional $20 million to its bid to protect itself from the potential costs of the transfer. Def.Ex. 5 ¶ 19–20. Alliant, on the other hand, was involved in the development of Olin's advanced round as recently as 1991, so that the technology transfer cost would be less if Alliant prevailed in the bidding.

In assessing the hidden costs involved in the transfer of advanced round technology to Olin or Alliant, however, Joseph De Lorenzo, Chief of the Heavy Armament Division of the United States Army's Armament Research, Development and Engineering Center at the Picatinny Arsenal, declared that as long as the subcontractor base continues to be available to both systems contractors, Olin could become the systems contractor for the advanced CE round in 6 to 9 months, at a cost of less than $1 million. Alliant could become the systems contractor for the advanced KE round "almost immediately," at no additional cost to the Army. Pl.Ex. 206 ¶¶ 12, 13. De Lorenzo currently heads the group within the Army responsible for providing technical guidance on all 120mm tank ammunition to Colonel Hartline and others.

Finally, defendants suggest an ultimate possible risk—"that the Army's tankers will not have the ammunition they need if and when they are next called into battle." Alliant Mem. at 29; Olin Mem. at 20. At the preliminary injunction hearing, Colonel Hartline expressed concern that transferring advanced round technology to the sole surviving contractor would involve some cost, time delays, and program risk, particularly in an environment of fiscal uncertainty. His exchange with the Court proceeded as follows:

Court: There is a risk that the Army's tankers will not have the ammunition they need if I enjoin this transaction?

Answer: I think so ... There is some risk we will not get the ammunition when we need it ... [T]here is a risk in delay. It will not be insubstantial, it'll cost money and time, and who knows when the next [conflict] will be, and what situation we'll be in.

P.I.Tr. at 37, 133.

The official Army position, however, as stated by Conver and Hartline, is that the Army has "no objection" to the merger. As Colonel Hartline testified at the hearing, "The Army's ... policy is it has no objection to the merger, it's not for it or against it." P.I.Tr. at 133. Conver, the sole officer authorized to represent the Army's official position, has confirmed that the Army "has no objection to the proposed merger," and "take[s] no official position concerning the antitrust implications of this transaction." Def.Ex. 7 ¶ 2.

The Army's own actions best evidence its appraisal of the security threat. The Army has indicated that absent the merger, it intends to proceed with its original plan of a competitive bid for the sole source contract. Pl.Ex. 31 at 4–5, 9, 15. Its Acquisition Strategy Report concludes,

Although Alliant has not produced the [advanced KE] cartridge and Olin has not produced the [advanced CE] cartridge, based on previous production of similar cartridges and necessary use of the same vendor base, both systems contractors are qualified to produce all requirements.

*Id.* at 9. In the Army's consideration, therefore, both Alliant and Olin are capable of contracting for the entire 120mm package, including the advanced tacticals, without significant risk. The Strategy Report nowhere suggests that the quality, reliability, performance or timely delivery of the

advanced tactical rounds would be jeopardized if either Alliant or Olin bid to became the sole systems contractor. Colonel Hartline also testified that both companies have the capacity to produce all the rounds, P.I.Tr. at 134, and stated, "I'm not saying it's a matter of lives will be lost." *Id.* at 133.[3]

The judgment that both Alliant and Olin are qualified to act as systems contractor on both advanced tactical rounds is confirmed by three current and former Army and Department of Defense officials experienced with the advanced tactical rounds. De Lorenzo has declared that "there is no appreciable risk that the winner of a competition between Alliant and Olin for either of the advanced tactical rounds would not be able to produce the rounds." Pl.Ex. 206 ¶ 15.

Howard Krosser, formerly Deputy Project Manager in charge of tank ammunition and Technical Director at the Army's Picatinny Arsenal, oversaw the program that resulted in the development of the advanced KE and advanced CE tactical rounds. Krosser declares that, so long as the existing subcontractor base is available, either defendant could become systems contractor for both the advanced tactical rounds within six months, "at minimal costs and with relatively insignificant risk to the Army." Pl.Ex. 214 ¶ 14.

Ray Thorkildsen, a defense industry consultant, states that "either Alliant or Olin should be able to act as systems contractor for the advanced round that it is currently not developing without significant risk to the Army ... the risk to the government of either company not being able to produce both of the advanced tactical rounds is negligible." Pl.Ex. 205 ¶ 22.

The subcontractors such as Bulova and Motorola that produce the most critical components of the advanced tactical rounds have indicated they will continue to produce those components for whichever defendant is the systems contractor. Pl.Ex.

209 ¶ 4; Pl.Ex. 210 ¶ 5; *see also* Pl.Ex. 205 ¶¶ 25, 28. The Army Acquisition Strategy Report states that regardless of which defendant becomes the systems contractor for all 120mm rounds in the downselect, the winner will have access to the present base of subcontractor suppliers. Pl.Ex. 31 at 9.

The primary technology transfer concern apparently would be whether Olin's Flinchbaugh facility would continue producing the advanced KE tactical sabot should Alliant win the downselect. Here, it is more likely than not that, should Olin lose a competitive bid, its employees and expertise would be available to Alliant either at the Army's direction, or on the open market.

At the hearing, Colonel Hartline testified that the Army legally can direct a systems contractor to use a particular subcontractor. Hartline testified that although it would be "very unusual" to designate a facility from a company competing in a downselect, this has been done. P.I.Tr. at 25. In his testimony before the FTC, Morgan confirmed that the Army will direct the winner of the downselect to use certain specified subcontractors, regardless of whether the winner is Olin or Alliant. Even in the case of Olin's Flinchbaugh facility, Morgan declared that the Army can and will direct the use of Flinchbaugh as the subcontractor for certain components regardless of whether Alliant or Olin becomes the systems contractor. Morgan testified as follows:

Q: You said that whether there's a merger or a down-select, that you'll be specifying subcontractor [sic]. Is that right?

Morgan: Yes ... We will specify, indeed, that Alliant goes to at least two of Olin facilities.

Q: Flinchbaugh and St. Marks?

---

3. The degree of security risk involved in the transfer also is brought into question by the fact that Congress presently is reconsidering funding for the advanced tactical 120mm program. The Congressional Conference Committee on the Department of Defense Appropriations recently questioned whether the advanced KE round "should remain in production" and directed the General Accounting Office ("GAO") to study the need for this ammunition. Pl.Ex. 259 at 90–91.

Morgan: Flinchbaugh and St. Marks. Pl.Ex. 212 at 95–96; *see also* Pl.Ex. 62 at 1.

Finally, should the Army decide the technology and production risk to the advanced tactical rounds would pose a genuine threat to national security, the Army could choose to procure all of the training rounds from the lower bidder by competition, while continuing to procure the advanced tactical rounds from the two existing suppliers, Olin for KE rounds and Alliant for CE rounds. As stated by Morgan, maintaining two producers for the advanced rounds would cost the Army an estimated additional $3 to $4 million per year, in the remote event of such a contingency. Pl.Ex. 212 at 118.

The Army also could, as it did during the Desert Storm campaign, resolve a shortage of 120mm tactical ammunition by purchasing from the German Rhinemetal company, which actually created and licensed the original critical technology to the Army for the use of defendants.

Given the above testimony and sworn declarations, the substantial experience of both Alliant and Olin in developing and manufacturing all 120mm rounds, the likely availability of the subcontractors and their employees to the winner of a competitive bid, the Army's ability or intention to direct use of certain subcontractors, and its official position of neutrality regarding the merger, it is more likely than not that the intangible costs of the technology transfer resulting from a competitive bid, if any, would not be significantly greater than those involved in a merger. Thus, the risks identified by Colonel Hartline are remote.

## II. CONCLUSIONS OF LAW

Section 13(b) of the FTC Act provides that the FTC may obtain a preliminary injunction to prevent an acquisition pending the Commission's administrative adjudication of the merger's legality. Final resolution of this matter on the merits, therefore, will be provided in administrative proceed-

ings before the FTC, with the right of appeal by the losing party to the Court of Appeals for the District of Columbia Circuit. 15 U.S.C. § 45(c). The only question before this Court, therefore, is whether the FTC has made a showing adequate to justify preliminary relief.

■ The FTC Act requires that, in order to prevail on a motion for a preliminary injunction, the Commission must demonstrate that there is a likelihood that it will prevail on the merits and that preliminary relief would serve the public interest.[4] *See FTC v. Exxon Corp.*, 636 F.2d 1336, 1343 (D.C.Cir.1980). Thus, the agency is

> not held to the high thresholds applicable where private parties seek interim restraining orders. Most importantly, the [statute] lightened the agency's burden by eliminating the need to show irreparable harm.

*FTC v. Weyerhaeuser Co.*, 665 F.2d 1072, 1082 (1981) (footnotes omitted). To prevail, the Commission need only raise "questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation ... by the FTC in the first instance and ultimately by the Court of Appeals." *FTC v. Beatrice Foods, Inc.*, 587 F.2d 1225, 1229 (D.C.Cir. 1978). Furthermore, there is a "presumption in favor of a preliminary injunction when the Commission establishes a strong likelihood of success on the merits." *FTC v. PPG Industries, Inc.*, 798 F.2d 1500, 1507 (D.C.Cir.1986).

### A. *Likelihood of Success on the Merits*

■ Under § 7 of the Clayton Act, plaintiff must demonstrate a likelihood that the effect of the proposed merger may be "substantially to lessen competition or to tend to create a monopoly" "in any line of commerce in any section of the country." 15 U.S.C. § 18. Such a showing requires a preliminary determination of the relevant product market and the relevant geographic market. *Brown Shoe Co. v. United*

---

**4.** Section 13(b) provides that a district court may grant a preliminary injunction "[u]pon a proper showing that, weighing the equities and

considering the Commission's likelihood of ultimate success, such action would be in the public interest ..."

*States*, 370 U.S. 294, 324, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1962).

■ For the purposes of this preliminary injunction, the relevant product market is the products and services involved in the manufacture and related servicing of all current 120mm rounds and in the development of the advanced tactical rounds. Ordinarily, a product market is determined "by the reasonable interchangeability of use or the cross-elasticity of demand" between a product and its substitutes. *Brown Shoe*, 370 U.S. at 325, 82 S.Ct. at 1523. The factors to be considered include "the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors" as well as the cross-elasticity of production factors. *Id.* at 325 and n. 42, 82 S.Ct. at 1523 and n. 42. Under this standard, the Court in *Brown Shoe* concluded that the relevant product market was men's, women's, and children's shoes.

Applying the rules regarding product market to services, courts elsewhere have found that "the cluster" of services provided in the commercial banking system, *United States v. Philadelphia Nat. Bank*, 374 U.S. 321, 356, 83 S.Ct. 1715, 1737, 10 L.Ed.2d 915 (1963), and the accredited central station service business, including automatic burglar and fire alarms, sprinkler supervisory services, and watch services, *United States v. Grinnell Corp.*, 384 U.S. 563, 573, 86 S.Ct. 1698, 1705, 16 L.Ed.2d 778 (1966), constituted "distinct line[s] of commerce."

The training and tactical ammunition at issue here are not perfect substitutes for each other. Arguably, the various types of rounds, and particularly the training versus the tactical rounds, have peculiar characteristics and uses, as was true in *Brown Shoe* for boys' and girls' shoes. Nevertheless, like *Brown Shoe*, the rounds and their services qualify as one market under the *Brown Shoe* test. Their production requires the systems contractor or contractors to render similar services to the Army. The products procured using these services are no less similar than those defined as

one line of commerce in *Brown Shoe* and *Philadelphia Nat. Bank*. The rounds share cross-elastic production factors, production facilities, and overhead costs. All 120mm rounds are produced for a single customer, the Army, for use in a single purpose, the practice and combat operation of the 120mm cannon arming M1 Abrams tanks. They are closely enough related in design, manufacture, and use to be clustered in a single market for the purposes of this preliminary injunction. *See e.g. Grinnell*, 384 U.S. at 573, 86 S.Ct. at 1705.

The parties agree that the relevant geographic market is the United States. The Army controls access to the critical ammunition technologies, and the Army's present mobilization base policy limits Army contracts to domestic suppliers. There is no evidence that the Army would deliberately switch to a foreign supplier, except in a unique and temporary emergency, such as apparently occurred in connection with the Desert Storm campaign.

■ Monopoly power is defined as "the power to control prices or exclude competition." *United States v. E.I. du Pont De Nemours & Co.*, 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956). Generally, courts infer the existence of monopoly power from a predominant share of the market. *Grinnell*, 384 U.S. at 571, 86 S.Ct. at 1704. Here, evidence is overwhelming that the merger will create a total monopoly for the purposes of the 1994–98 contract, as well as over all four 120mm rounds for the foreseeable future. Alliant and Olin are the only two producers for the relevant market, and the merger would leave Alliant with 100 percent market share in all 120mm ammunition. The *Department of Justice Merger Guidelines* consider a market "highly concentrated" where the Herfindahl–Hirschmann Index ("HHI") is over 1800. *PPG Industries*, 798 F.2d at 1503. Alliant's HHI would be the maximum possible, 10,000.

Entry by either the Army or a new producer in the event of abuse of monopoly power also is unlikely. As discussed above, the Army has indicated that resource constraints make breakout an im-

probable option. As for new entry, the Army is the sole domestic customer for 120mm ammunition and has absolute control over commercial entry. In an age of military budget cuts, even if the merger occurred and Alliant abused its resulting monopoly power to demand an exorbitant price for the 1994–98 contract, entry of a new firm would be unlikely. The technical data package ("TDP") necessary for the production of 120mm rounds probably makes timely new entry (other than by Olin) infeasible, "due to the substantial facilities investment required to produce these rounds of ammunition." Pl.Ex. 31 at 11. Alliant itself has assessed the probability of new entry after the merger at only 5 percent. Pl.Ex. 126. As stated in the original Memorandum filed on November 18, 1992 with the Order in this case,

> Entry into the market by either the Army or a new private source likely would be more costly and time consuming than would the development and production by either Alliant or Olin of the rounds presently contracted from the other. If the monopoly created by the merger abuses its power, it therefore is not likely to be broken by a new entry or restrained by a threat thereof.

Thus, plaintiff's showing of the creation of a 100 percent monopoly for the bid on the 1994–98 contract and the barrier to future entry alone suggest a *per se* violation of the Clayton Act justifying plaintiff's preliminary relief.

Plaintiff, however, need not rely exclusively on the facial monopoly the merger would create. By definition, the merger would not merely lessen competition for the five-year training rounds contract. It would eliminate it. Both parties also concede the merger would allow Alliant to significantly raise the price of the training contract over that in a competitive bid. Considering all parties' estimates, it is reasonable to infer that this elimination of competition will raise the cost of the contract for the Army between five and 23 percent, or $25 to $115 million. Thus, in addition to creating a 100 percent monopoly, the merger will allow Alliant to both "control prices [and] exclude competition."

*E.I. du Pont*, 351 U.S. at 391, 76 S.Ct. at 1005.

■ Defendants argue that an injunction is inappropriate because the merger would provide greater competitive benefits than the alternative authorized by the antitrust laws. Although the competitive effect of a winner-take-all bid might be to save a limited amount of money on training rounds, defendants assert the bid also would require the Army to incur much larger costs, risks of failure, procurement delays, and uncertainty in obtaining the advanced tactical rounds.

The anticompetitive effects of the merger, however, are not counterbalanced by the competing efficiency considerations alleged by defendants. Defendants' concerns regarding the risks of transferring technology to cost, delay, and quality are speculative at best. As defendants admit, these are costs "which only the Army can value." Def. Proposed Findings ¶ 75(b). The Army, the best witness to such costs, apparently has not found them sufficient to require its intervention to urge consummation of the proposed merger. Defendants furthermore fail to consider the not insignificant restructuring and transaction costs that would result from the merger. Pl.Ex. 202 ¶¶ 35, 36.

As stated previously, the facts on the record require the reasonable inference that the additional intangible costs of a competitive bid, if any, would not significantly outweigh those of a merger. They do not outweigh the public interest deficits likely to follow from preclusion of competition, the 100 percent monopoly, and the significant price increase which probably would result from the merger.

Nevertheless, Alliant asserts that the Competition in Contracting Act, 10 U.S.C. § 2304, ("CICA"), "mandate[s] that no injunction issue here." Alliant Mem. at 10. This assertion is without foundation. The Act requires generally that in procuring property or services, Army agencies "shall obtain full and open competition through the use of competitive procedures." § 2304(a)(1)(A). The parties agree that

Congress' purpose in adopting the CICA was to promote competition in military procurement where possible.

Furthermore, contrary to Alliant's assertion, no exception to this requirement precludes injunctive relief. It has been stated authoritatively that statutory exceptions are to be "narrowly construed," to those "plainly and unmistakably within its terms and spirit." *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493, 65 S.Ct. 807, 808, 89 L.Ed. 1095 (1945). Alliant relies on § 2304(c)(3)(A) of the CICA which provides that:

> (c) The head of an agency may use procedures other than competitive procedures only when—
>
> (3) it is *necessary* to award the contract to a particular source or sources in order (A) to maintain a facility, producer, manufacturer, or other supplier available for furnishing property or services in case of a national emergency or to achieve industrial mobilization
>
> . . .

(emphasis added). Defendants argue that this section authorizes the Army to procure 120mm ammunition through non-competitive means in this case. They further assert that because the Army legally may choose to procure from a sole contractor and thereby establish a monopoly, "it would turn CICA on its head for the Army to be penalized because it chose a single supplier by this transaction." Alliant Mem. at 11.

Defendants' argument fails on two grounds. First, by its terms, the statute allows the Army to procure services through "procedures other than competitive procedures" only when this is "necessary" to "maintain" a particular facility or supplier "in case of a national emergency or to achieve industrial mobilization." Defendants have made no showing that the anticompetitive merger is "necessary" for the Army for the specific purposes of the statutory exception. Considering the pro-competitive thrust of the Competition in Contracting Act, exceptions to it must be strictly construed. In fact, the Army clearly has a competitive alternative in this case—a winner-take-all competitive bid—which the Army itself planned before the merger plan appeared and which it since has indicated will be pursued if the merger does not occur. Pl.Ex. 31 at 4–5, 9, 15. The present circumstances therefore do not fall within the scope of the exception on its face.

In addition, even where the Act allows the *Army* to let a contract without competition, it does not follow that the statute similarly authorizes *private parties* to combine to avoid an otherwise competitive bid. Here, the Army had intended to proceed with a competitive bid to reduce its suppliers to a single source. Nothing in the statute authorizes private companies unilaterally to eliminate the Army's competitive option and to offer the Army the *fait accompli* of a single choice. And nothing in the record supports the contention that it is the Army, rather than defendants, that has chosen this transaction.

Thus, because the merger will probably raise the price of the contract for the training rounds, will establish a 100 percent monopoly over the production of all four rounds, and will entirely eliminate competition in the bid for the training rounds contract, plaintiffs have demonstrated a "strong likelihood" that they will prevail in their Clayton Act claim. *PPG Industries*, 798 F.2d at 1507.

### B. *Benefit to the Public Interest*

The second consideration to be weighed in granting or denying a preliminary injunction is the injunction's impact on the public interest. "The heart of our national economic policy long has been faith in the value of competition." *Standard Oil Co. v. FTC*, 340 U.S. 231, 248, 71 S.Ct. 240, 249, 95 L.Ed. 239 (1951). Through the Clayton and Sherman Acts, Congress has designated the promotion of competition as serving the public interest. A demonstration of probable anticompetitive effects, therefore, generally alone is adequate to satisfy the equity requirement for injunctive relief. As this Circuit consistently has held, there is a "presumption in favor of a preliminary injunction when the Commission establish-

es a strong likelihood of success on the merits." *PPG Industries*, 798 F.2d at 1507; *see also Weyerhaeuser*, 665 F.2d 1072, 1085 (D.C.Cir.1981).[5]

■ Defendants, however, raise two public interest claims in an effort to rebut this presumption. First, defendants point to the alleged inefficiencies associated with the competitive bid, to argue that the balance of the equities weighs against the presumptive preference for competition in this case.

Allegations that competition is not in the best interest of the Nation or an industry are not new to the courts. Banks, engineering societies, and other industries of social and economic consequence have argued that economies of scale and other efficiencies entitle them to an exception to the antitrust rules. *See, e.g., Nat. Society of Professional Engineers v. United States*, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978); *Philadelphia Nat. Bank*, 374 U.S. 321, 83 S.Ct. 1715.

There are circumstances indeed where greater market concentration is tolerated when the net result is to increase or facilitate competition. *Brown Shoe*, 370 U.S. at 319, 82 S.Ct. at 1521. Here, however, the possibility that the Army might achieve greater efficiencies of scale as a result of the merger is insufficient to override the public's clear and fundamental interest in promoting competition. As the Supreme Court has noted, Congress already has weighed these interests and placed its blessing on the side of competition.

> [A] merger the effect of which "may be substantially to lessen competition" is not saved because, on some ultimate reckoning of social or economic debits and credits, it may be deemed beneficial. A value choice of such magnitude is beyond the ordinary limits of judicial com-

petence, and in any event has been made for us already, by Congress ... *Philadelphia Nat. Bank*, 374 U.S. at 371, 83 S.Ct. at 1745. Thus, "[e]ven assuming occasional exceptions to the presumed consequences of competition, the statutory policy precludes inquiry into the question whether competition is good or bad." *Professional Engineers*, 435 U.S. at 695, 98 S.Ct. at 1367.

Defendants raise a second, and more credible, claim that, in this case, the public interest in promoting competition by enjoining the merger is outweighed by serious national security considerations. Specifically, they suggest that a competitive bid would create a risk that "the Army will not have the advanced tactical ammunition they need" in the event of a national emergency. Def. Findings at ¶ 80. The clear, indeed explicit, suggestion, is that enjoining the merger might impair military operations.

These are serious concerns, which, as defendants assert, are entitled to "great weight." Unquestionably, circumstances could arise under which national defense priorities would override any other public interest in preserving competition that might exist. Under such circumstances, deference to clearly stated and authoritative military caveats would be appropriate and substantial. *Compare, e.g., Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 716, 51 S.Ct. 625, 631, 75 L.Ed. 1357 (1931) ("No one would question but that a government [in wartime] might prevent actual obstruction to its recruiting service or the publication of the sailing dates of transports or the number and location of troops.").

Those circumstances are not presented here, however. Great respect for the thoughtful, professional judgment of the Army witnesses who have testified should not obscure the only official position taken

---

5. Defendants urge that even if the Commission demonstrates a likelihood of success on the merits, compensatory damages would provide appropriate relief. Damages, however, would not adequately compensate for the merger's potential anticompetitive harm. *See Weyerhaeuser*, 665 F.2d at 1085. Not only are the price benefits of a competitive bid not precisely quan-

tifiable absent competition, but it is authoritatively recognized that competition produces unquantifiable efficiencies in "all elements of a bargain—quality, service, safety and durability—and not just the immediate cost." *Nat. Society of Professional Engineers v. United States*, 435 U.S. 679, 696, 98 S.Ct. 1355, 1368, 55 L.Ed.2d 637 (1978).

by the Army: it is "not opposed" to the merger. As Assistant Secretary Conver declared, the Army "has no objection to the proposed merger," and "take[s] no official position concerning the antitrust implications of the transaction." Def.Ex. 7 ¶ 3.

The Army could have formally intervened by itself or through the Justice Department, with its antitrust expertise, to assert a fundamental national security interest to be balanced against the public interest in competition. Both Departments as institutions, however, are conspicuously absent here. As stated in the original Memorandum filed with the Order in this case: "With all respect for the two conscientious and impressive Army witnesses who testified on behalf of the defendants, their testimony was too muted and speculative to overcome the critical fact that the Army as an institution does not recommend the merger or seek to bar the injunction of it."

The record also explains the neutral position of the military here. In addition to the fact that critical technology and personnel will be available through the subcontractors to the winner of a competitive bid, as discussed above, the evidence shows that the Army has other means of securing its interests. As a number of Army personnel have stated, the Army is capable of directing use of critical facilities by the systems contractor, including the Olin Flinchbaugh facility, if it is concerned about the transfer of technology. Furthermore, it is the Army that originally elected to downselect through a competitive bid on the training rounds. If the Army determines later that a winner-take-all contract would be detrimental to the advanced tactical program, it has the legal right to continue to procure the advanced KE rounds from Olin and advanced CE rounds from Alliant.

### III. CONCLUSION

This matter is sufficiently important, and time factors are sufficiently important to the parties and the Army, to justify expedited resolution on the merits by the Commission and, if necessary, appellate review. Meanwhile, at this preliminary stage, plain-tiff has met its burden of demonstrating both a likelihood of success on the merits and that the public interest favors an injunction. Accordingly, the November 18, 1992 Order granted plaintiff's motion and enjoined the merger pending expedited Commission consideration of the merits.