## WESTINGHOUSE ELECTRIC CORPORATION, Plaintiff,

v.

## UNITED STATES DEPARTMENT OF the NAVY and John B. Dalton, Secretary of the Navy, Defendants,

and

## Lockheed Martin Corporation, Intervenor.

### Civ. A. No. 95–0762.

United States District Court,
W.D. Pennsylvania.

June 30, 1995.

---

Richard W. Gladstone, Eckert, Seamans, Cherin & Mellott, Pittsburgh, PA, Philip J. Davis, Phillip H. Harrington, Stanley R. Soya, Jennifer L. Radner, Wiley, Rein & Fielding, Washington, DC, for Westinghouse Elec. Corp.

Albert W. Schollaert, U.S. Attorney's Office, Pittsburgh, PA, for U.S. Dept. of Navy, John B. Dalton.

W. Thomas McGough, Jr., Gregory B. Jordan, Reed, Smith, Shaw & McClay, Pittsburgh, PA, for Lockheed Martin Corp.

## MEMORANDUM

LANCASTER, District Judge.

Plaintiff, Westinghouse Electric Corporation, seeks a declaratory and injunctive relief

in connection with a Navy procurement contract. Westinghouse has standing to bring this suit.

Westinghouse alleges that it is the sole producer and supplier to the Navy of a sophisticated anti-submarine warfare combat system ("SQQ–89"). Westinghouse contends that it won the right to be the sole-source for the system in 1992 after a down select competition between it and the General Electric Corporation. Westinghouse alleges that the Secretary of the Navy now intends to conduct, in violation of the Competition In Contracting Act, 10 U.S.C. § 2304, a limited competition between Westinghouse and Lockheed Martin Corporation for the Navy's future requirements for this system.

Westinghouse further contends that the Secretary made certain statements at the time of the down select competition that were justifiably understood by Westinghouse as indicating that the winner of the competition would be awarded all future contracts for this system on a non-competitive sole-source basis. According to Westinghouse, because it relied on these statements to its detriment, the Secretary is now equitably estopped from awarding the contract on any other basis. Westinghouse seeks an order requiring the Secretary to negotiate with it for any further system requirements on a sole-source basis.

Before the court are the parties' cross-motions for summary judgment. For the reasons that follow, the court finds that there are no genuine disputes of any material fact, and the Secretary is entitled to judgment as a matter of law.

I. *BACKGROUND*

The court assumes that the parties are familiar with the general background, allegations, and defenses in this complex litigation, and the court will not discuss them at length here. The undisputed facts material to the motion, however, are as follows:

The Surface Ship Anti–Submarine Warfare Combat System is used on various classes of Navy ships and detects, tracks, and classifies targets; controls weapon settings; and coordinates information with the ships' combat direction system. The Navy contracted with General Electric on a sole-source basis for the first such system in fiscal year 1988 (FY88) and again in FY89.

At the same time, the Navy established what is called a "leader/follower" program for this system. Under such a program, in order to ensure a reliable supply, the Secretary transferred technology from the leader source, General Electric, to a follower source, who would serve as a second supplier. In 1987, Westinghouse was selected competitively as the follower source. The first dual source competition between General Electric and Westinghouse was held in 1990; Westinghouse won the FY90 award and General Electric won the FY91 award.

Subsequently, the Navy reevaluated its dual source system and concluded that it was costly and inefficient. As a result, the Navy decided that instead of a dual source system, the "successful offeror for the [FY92] production requirements [would] become the sole producer, system engineering and design agent contractor for the AN/SQQ–89CV program." A.R.Tab 21 at 125. Ultimately, the Navy solicited bids on the system from Westinghouse and General Electric, reiterating that "[t]his competition will result in a downselect decision for the AN/SQQ–89(v) program. The successful offeror will become the sole producer, system engineering and design agent contractor for the AN/SQQ–89(v) program." A.R.Tab 38 at 266.

The Navy awarded Westinghouse the FY92 contract. At that time, both Westinghouse and the Navy expected that Westinghouse would be the sole producer of the system for the life of the program. Westinghouse contends and the record supports a finding that relying on the fact that it was bidding for the life of the program, Westinghouse arranged long-term low-priced contracts with suppliers and bid a lower price.

Subsequently, however, Martin Marietta purchased the General Electric Aerospace business unit involved in the system program. After Lockheed merged with Martin Marietta, the company advised the Secretary that it was interested in and had the ability to compete for the system contract. As a result, the Navy decided to renew limited competitive bids between Lockheed and

Westinghouse for the system, and on May 16, 1995, the Navy published a formal notice of its intent to procure the FY96 system competitively. Westinghouse responded by filing this complaint for declaratory and injunctive relief.

## II. *DISCUSSION*

### A. *Competition In Contracting Act*

██ Although there are other issues in this case, the threshold issue the court is called upon to decide is whether the Secretary of the Navy is statutorily mandated to withdraw an award from the competitive bid process when one or more of conditions that authorize the use of noncompetitive procedures is present. The court finds that the law does not require the Secretary to exercise this authority.

When the Departments of Defense, Army, Navy and Air Force; the Coast Guard; or the National Aeronautics and Space Administration contract for services or property other than land, and payment is to be made only from appropriated funds, then the agency must comply with the Competition in Contracting Act. In pertinent part, the Act requires the head of these contracting agencies to obtain full and open competition through the use of competitive procedures, including the soliciting of sealed bids and the requesting of competitive proposals. The Act reflects Congress's intent to increase the armed forces' use of competition in contracting and to impose more stringent restrictions on the award of noncompetitive, sole-source contracts. By adopting the Act, Congress intended to open the procurement process to all capable contractors who want to do business with the armed forces.

Under section 2304(c) of the Act, however, Congress granted the heads of these agencies the discretionary authority to use noncompetitive contracting procedures if one or more of seven specified exceptions are present. Westinghouse contends that three of those specified exceptions apply in this case: 1) the property or services needed by the agency are available from only one responsible source and no other type of property or services will satisfy the agency's needs; 2) it is necessary to award the contract to a particular source in order to maintain a supplier for furnishing property or services to achieve industrial mobilization; and 3) it is in the public interest to use noncompetitive procedures. However, the Secretary is not statutorily mandated to withdraw an award from the competitive bid process even when one or more of the specified exceptions is present. We reach this conclusion on several grounds.

First, Congress made clear that application of the exceptions is discretionary. For instance, in section 2304(b)(1), the Act states that an agency "*may* provide for the procurement of property or services covered by this chapter using competitive procedures but excluding a particular source in order to establish or maintain an alternative source or sources of supply." Similarly, section 2304(c) states that an agency "*may* use procedures other than competitive procedures only when" one of the seven exceptions apply.

If Congress intended to mandate that an agency use noncompetitive procedures when one of these exceptions applied, Congress could have used the appropriate language to clearly say so. Indeed, Congress used mandatory language, i.e. "shall," in other portions of the Act in contrast to its use of the permissive term "may" as discussed above. For example, section 2304(a)(1)(A) prescribes that an agency "*shall* obtain full and open competition through the use of competitive procedures" except as otherwise provided in the Act. Likewise, section 2304(a)(1)(B) dictates that an agency "*shall* use the competitive procedure or combination of competitive procedures that is best suited under the circumstances of the procurement."

Westinghouse has not directed our attention to any decision from any court that has held that an agency must withdraw a procurement contract from the competitive bid process when one of the seven exceptions is applicable to the contracting circumstances. Nor has the court discovered a decision that so holds. This is not surprising because it is simply not the law.

In summary, the court concludes that even assuming that one or more of the seven exceptions delineated under section 2304(c) is

present, the Secretary is not statutorily compelled to forgo the competitive bid process.

## B. Administrative Procedures Act

Although we have concluded that the Act does not compel the Secretary to withdraw the matter from the competitive process, the inquiry does not necessarily end there. Next, we address what apparently is Westinghouse's main contention, that is, whether the Secretary's failure to utilize the noncompetitive exceptions to the Act constitutes an abuse of discretion, and therefore, requires the court to set aside the decision under the authority of Administrative Procedures Act. 5 U.S.C. § 706.

Broadly stated, Westinghouse contends that because the Secretary decided in 1992 that a sole-source award for this system was appropriate under the circumstances and because, in Westinghouse's view, there has been no material change in circumstances, the Secretary abused his discretion by departing from his 1992 decision and reopening the contract to competitive bids. The court concludes that the Secretary did not abuse his discretion.

The Administrative Procedures Act does not create any substantive rights in a person aggrieved by governmental agency action, but rather, in the context of this case, it merely permits a judicial review of governmental action by a district court. See Lujan v. National Wildlife Fed'n, 497 U.S. 871, 882, 110 S.Ct. 3177, 3185, 111 L.Ed.2d 695 (1990); 5 U.S.C. § 702. The Act further provides that the reviewing court shall hold unlawful and set aside agency actions, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. 5 U.S.C. § 706.

Without specifically addressing the Administrative Procedures Act, the Court of Appeals for the Third Circuit has stated that a district court's scope of review is especially strict when reviewing the propriety of a government procurement contract. Sea–Land Serv., Inc. v. Brown, 600 F.2d 429, 434 (3d Cir.1979). The court of appeals explained that although the district court has jurisdiction over cases of this nature, its discretion is restricted, and government contract decisions should not be overturned unless "there [is] no rational basis for the agency's decision." Id. The court of appeals also teaches that "a showing of clear illegality is an appropriate standard to impose on an aggrieved bidder who seeks judicial relief." Id. Not surprisingly, the courts consistently have recognized the need to exercise restraint in interfering with procurement decisions and to honor a large measure of discretion in contracting officers.

In this case, submitting this procurement contract to a competitive process clearly is not illegal. Moreover, the record establishes that the Secretary's decision was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. The Secretary officially decided to limit competition on February 14, 1995 after three separate briefings held on January 5, 1995, January 13, 1995 and February 14, 1995. The briefings were conducted by the Navy's Program Executive Officer for Undersea Warfare. At these briefings, the officer explained why the contract was open to limited competition, why full competition was unnecessary, and why certain changes to the system were necessary.

Based on the Navy's research, analysis, and briefings, the Secretary decided to return to limited competition for several reasons. First, the Secretary determined that circumstances had changed since Westinghouse won the down selection competition in 1992. One of the changes involves Lockheed Martin's ability to compete against Westinghouse for the contract. Specifically, in 1992, the Secretary awarded Westinghouse the contract for the system after a direct competition with General Electric, the only other business entity capable of manufacturing the system. At the time, the Secretary assumed, if it was not expressly told, that as a result, General Electric would no longer maintain its capacity to produce the system. However, by way of correspondence dated November 5 1993, Martin Marietta, the purchaser of the General Electric Aerospace Unit, which is now owned by Lockheed Martin, advised the Secretary that it maintained full capacity to serve as a system supplier, outlined its capa-

bility, and advised the Secretary that it wanted to serve as the system contractor again in the future.

The second change involves subsequent variants of the system. In 1993 the Navy established a new variant, (v)10, to replace the (v)6 variant upon which the down select competition was based. Additionally, beginning in 1996, the Navy will be using yet another variant, the (v)x, which will require the producer to rewrite the associated display software.

Additionally, the Secretary calculated that the cost of switching from a sole-source process to a competitive bid process was an estimated eight million dollars ($8,000,-000.00). However, the Secretary also estimated that the likely savings to the Navy from awarding the contract on a competitive basis could be as much as forty-eight million dollars ($48,000,000.00). Therefore, the Secretary concluded that it could expect to recover the costs through competition.

The Secretary also analyzed the available information and concluded that as long as the contract was awarded on time, submitting this contract to competitive bids would not result in unacceptable delays. The Secretary similarly concluded that competition would not impact ship schedules or system performance.

The undisputed record also establishes that the Secretary afforded Westinghouse an opportunity to present its views on the matter to the Secretary prior to the Secretary making his procurement decision. Specifically, Westinghouse sent numerous letters to the Secretary outlining its position on the issue. Westinghouse officials also met with Navy officials on numerous occasions to discuss the issues. The Secretary considered, yet rejected, Westinghouse's reasons for why the Secretary should not submit this contract to competitive bids. Additionally, the Secretary responded to correspondence from various Congressmen who wrote to the Secretary on Westinghouse's behalf. Finally, the Secretary explained his reasons for submitting this contract to competitive bids before the Senate Armed Services Committee at a hearing conducted for that purpose on April 5, 1995.

The court will not provide a plenary review of the Secretary's decision, nor will we, as Westinghouse urges, recalculate the Secretary's mathematical estimates or analyze whether the Secretary's conclusions are impeachable. It is not the court's function to determine whether the Secretary's decision was a wise one or even a fair one. The court's review is limited to determining whether the Secretary's analyses and decisions were arbitrary, capricious, abuse of discretion, or otherwise not in accordance with the law. The court concludes that, taken as a whole, they were not.

### C. *Equitable Estoppel*

Finally, we address Westinghouse's argument that the government is equitably estopped from awarding this contract to any entity other than Westinghouse as a sole-source producer. We conclude that the doctrine of equitable estoppel is not applicable here.

■ In order to prevail on a traditional equitable estoppel theory, a party must prove that the respondent misrepresented a material fact and that the party reasonably relied on that misrepresentation to his detriment. *Monongahela Valley Hosp., Inc. v. Sullivan,* 945 F.2d 576, 589 (3d Cir.1991). The Supreme Court has made clear, however, that the government may not be estopped on the same terms as other litigants. *Office of Personnel Management v. Richmond,* 496 U.S. 414, 419, 110 S.Ct. 2465, 2468–69, 110 L.Ed.2d 387 (1990). Indeed, although the Supreme Court has not adopted a categorical rule that equitable estoppel may not be used against the government in any circumstances, it has come close. The Court itself has expressly noted that it has reversed every case it has reviewed in which a lower court has applied equitable estoppel against the government. *Id.* at 422, 110 S.Ct. at 2470.

■ Nevertheless, to the extent that equitable estoppel is viable against the government, when estoppel is asserted, the party must prove, in addition to a material misrepresentation, affirmative misconduct by the government. *SIU de Puerto Rico v. Virgin*

*Islands Port Auth.,* 42 F.3d 801, 803–04 (3d Cir.1994). We find no evidence in the record of this case that supports a finding of affirmative misconduct by the government.

■ We have carefully considered plaintiff's arguments in this regard and, although artfully stated, plaintiff simply attempts to piggyback a claim of affirmative misconduct onto its claim of misrepresentation. This argument falls short of the mark. The Court of Appeals for the Third Circuit has stated clearly and repeatedly that the affirmative misconduct must be distinct from the alleged misrepresentation that might warrant the use of equitable estoppel against a non-government litigant. *Id.; Monongahela,* 945 F.2d at 589. Accordingly, a party cannot simply reassert the same facts and circumstances that constituted the misrepresentation element and relabel it as affirmative misconduct. We assume that the court of appeals understood the impact of the words it used and their practical effect.

In summary, Westinghouse has failed to place on the record evidence that the Secretary has engaged in any affirmative misconduct in regard to this matter; therefore, equitable estoppel cannot be used against the Secretary in this case.

■ Finally, there is an additional reason why equitable estoppel is inappropriate in this case, a reason equally as important as those discussed previously. As its name implies, the doctrine of equitable estoppel has inherent within it equitable considerations and, as in any doctrine invoking the court's equity, the court must balance the legitimate competing interests of the parties involved. The court has done so and finds that even to the extent that the elements of a properly invoked equitable estoppel theory are arguably present in this case, the competing interests involved weigh in favor of the Secretary for several reasons.

First, the Secretary's interest in having this contract submitted to two bidders is substantial. Foremost, it complies with Congress's intent that the Competition In Contracting Act ensures full and open competition for defense procurement contracts. The benefits of competition for procurement contracts are obvious: it will allow more business entities, such as Lockheed, to participate in government procurement programs; and it will advance the public's interest in ensuring that defense contracts are awarded at the lowest cost to the public funds. Indeed, it fosters not only a lower cost to the public funds, but also the best contract. Additionally, the ongoing expectation for competition for procurement contracts provides an incentive to American business to invest their capital and resources in more effective, innovative, and cost efficient products.

On the other hand, Westinghouse's interest in restricting the competition to itself by receiving a sole-source award is the antithesis of the Congress's intent in passing the Act and would serve no interest other than its own financial gain. In either event, Westinghouse is not precluded from competing for the contract. And, if, as it contends, an award to another contractor would result in unnecessarily high costs to the government, Westinghouse presumably would be the low offerer and, thus, win the award.

We find that the government's interests in going forward with competition in this case outweighs any equitable rights Westinghouse could assert by pleading estoppel.

### III. *CONCLUSION*

For the foregoing reasons, the court grants defendant's and intervenor's motions for summary judgment and denies plaintiff's motion for summary judgment. The appropriate order follows.

### *ORDER*

AND NOW, this __ day of _____, 1995, upon consideration of all motions for summary judgment, briefs in support and opposition and oral testimony, IT IS HEREBY ORDERED that defendant's motion for summary judgment [document # 32] and intervenor's motion for summary judgment [document # 30] are GRANTED. Plaintiff's motion for summary judgment [document # 34] is DENIED. The Clerk is directed to mark this case closed.