**WESTINGHOUSE ELECTRIC CORPORATION,**
Plaintiff,

v.

The **UNITED STATES,** Defendant.

No. 97–346C.

United States Court of Federal Claims.

June 17, 1998.

Kent R. Morrison, Washington, DC, attorney of record for plaintiff. Crowell & Moring, of counsel.

Franklin E. White, Jr., Department of Justice, Washington, DC, with whom was Assistant Attorney General Frank W. Hunger, for defendant. David M. Cohen, Director, Sharon Y. Eubanks, Assistant Director, and Robert E. Lieblich and James I. Menapace, Naval Sea Systems Command, of counsel.

## OPINION

FUTEY, Judge.

This contracts case is before the court on defendant's motion to dismiss for failure to state a claim upon which relief can be granted. Plaintiff contends that defendant, acting through the Department of Defense, the Department of the Navy, and the Naval Sea Systems Command, committed to making plaintiff the sole-source provider for the Navy's AN/SQQ–89 ("SQQ–89") program. Plaintiff asserts that defendant breached this commitment by a 1995 decision to compete the contracts for defendant's requirements concerning the SQQ–89 program and subsequent contract award to another entity. Plaintiff seeks damages and other relief the court deems necessary. Defendant responds that any commitment to make plaintiff the sole-source provider for the program beyond the term of the contracts contradicts the plain language of those documents.

### Factual Background

The SQQ–89 program is an integrated anti-submarine warfare system, comprised of various acoustic sensors that transmit, receive, and process acoustic data for display to multiple tactical decision makers and operators. The system provides target detection, tracking, and classification capabilities; controls setting of the ship's anti-submarine warfare weaponry; and coordinates anti-submarine warfare information with the ship's combat direction system. In 1986, General Electric Co. ("GE") was the only qualified producer for the SQQ–89 program.

In 1986, a "leader/follower" system was established for the SQQ–89 program for the purpose of opening a second supply source. As a condition of its contract award for fiscal year ("FY") 1988 and FY 1989, GE trained Westinghouse to provide a second supply source for the Navy's SQQ–89 requirements. By late 1989, Westinghouse was deemed a qualified producer for the SQQ–89 program, and a competition was held between Westinghouse and GE for the FY 1990 contract. For both FY 1990 and FY 1991, the Navy had intended to split the contract award; in each fiscal year, however, the winner's bid was considered so much more beneficial to the government that the victor gained the entire award. This competition was won by Westinghouse for FY 1990, and it was awarded the entire requirements contract. For FY 1991, GE won the competition and received the entire contract.

In late 1991, the Navy decided to employ a "downselect" competition for a four-year procurement for FY 1992–1995. By "downselecting," the Navy intended to choose only one offeror rather than potentially splitting the award. The Navy reached this decision after concluding that the dual source system

of supply was costly and inefficient. Thus, in the May 13, 1992 issue of Commerce Business Daily, the Navy announced a winner-take-all competition between GE and Westinghouse for a four-year contract, one base year with three one-year options, for FY 1992–1995. The Commerce Business Daily announcement stated: "The successful offeror will become the sole producer, system engineering and design agent contractor for the AN/SQQ–89 program."[1]

The Navy issued two solicitations on May 28, 1992 for offers relating to the program. Solicitation No. N00024–92–R–6300(S) envisioned a firm-fixed-price production contract for the program, whereas Solicitation No. N00024–92–R–6312(S) contemplated a cost-plus-fixed-fee contract for engineering services related to the program. Each solicitation sought the award of a contract for one base year with three one-year options. Section M of each solicitation pronounced that the Navy would select only one offeror for both contracts exclusively on the basis of price. In addition, Section M also provided the following: "This competition will result in a downselect decision. The successful offeror will become the sole producer, system engineering and design agent for the AN/SQQ–89(V) program."[2] Section M was incorporated into each of the contracts.

Prior to the issuance of the solicitations, the Navy executed a Class Justification and Approval ("CJ & A").[3] The CJ & A was approved by the Assistant Secretary of the Navy on May 18, 1992. Plaintiff does not allege it reviewed the CJ & A prior to the submission of its bid. The CJ & A stated the Navy's justifications for conducting a less than full and open competition for multiple acquisitions, meaning to downselect the competition for the program with only GE and

Westinghouse as competitors. According to the CJ & A, the Navy elected the "downselect" option because there were insufficient annual production requirements to keep two sources operating at minimum cost-effective capacity; there was no significant upgrade program to compete; Westinghouse demonstrated its ability to meet the program's requirements; and Westinghouse's production of parts which it had not made previously presented minimal risks. Plaintiff contends the CJ & A contained the following statements: "As a result of the downselect decision, the Navy plans sole-source procurements with the successful offeror beginning in FY96." Additionally, "The successful offeror for the production requirements will become the sole producer, system engineering and design agent contractor for the AN/SQQ–89(V) program."

Westinghouse argues that, on the basis of the statements and representations made by the Navy, it understood the winner of the competition for the FY 1992–1995 contracts would become the sole-source producer for the entire duration of the program. Westinghouse contends it repeatedly notified the Navy that it believed itself to be competing "to be the sole-source for the entire SQQ–89 program."[4] Further, plaintiff states it submitted a lower bid than it otherwise would have presented because it had teamed with subcontractors for the duration of the program and received price commitments from them based on a life-of-the-program arrangement as opposed to a four-year contract. But for the Navy's alleged commitment to make the winner of the FY 1992–1995 contract competition the sole-source for program requirements, Westinghouse claims its bid would not have been so favorable. Additionally, Westinghouse asserts that it made the

---

1. The issue of Commerce Business Daily from which this quote is taken was provided neither by attachment nor appendix. In its answer, defendant states, with regard to the complaint's citations to Commerce Business Daily, that it admits this allegation to the extent it is supported by the cited document.

2. Neither the solicitations nor the contracts, which presumably would contain the language of Section M, were provided by attachment or appendix. Nonetheless, there is no factual dispute

that Section M reads any way other than as quoted here.

3. The CJ & A, or a copy thereof, is not provided by attachment or appendix. In its answer, defendant states, with regard to the complaint's citations to the CJ & A, that it admits those allegations to the extent they are supported by the cited document.

4. Complaint (Compl.) at ¶ 22.

following statement in its Best and Final Offer: "Our bid is deliberately aggressive to ensure that Westinghouse is the supplier of [anti-submarine warfare] Combat Systems through the 90s and beyond." Westinghouse claims the Navy never informed it of any disagreement with Westinghouse's understanding concerning the purported program-life sole-source status it would allegedly grant to the competition winner.

The Navy eventually awarded the contracts to Westinghouse. In 1995, however, the Navy issued two solicitations for the SQQ–89 program's requirements for FY 1996–2000. Westinghouse and Lockheed Martin [5] were extended invitations to compete. Plaintiff attempted to prevent this competition by filing suit in the U.S. District Court for the Western District of Pennsylvania seeking declaratory and injunctive relief. In the district court's June 30, 1995 decision, the Navy's motion for summary judgment was granted. The court held that the government was not preempted from conducting a competitive bid process despite the statutory exemption permitting its non-exercise, that using the competitive procedure was not an abuse of discretion, and that Westinghouse failed to establish the element of administrative misconduct that was necessary to advance an equitable estoppel cause of action. *Westinghouse Elec. Corp. v. United States Dep't of Navy,* 894 F.Supp. 204 (W.D.Pa.1995).[6] On October 6, 1995, Westinghouse informed the Navy of its intentions to compete nonetheless, but objected on the grounds that the competition breached the Navy's alleged commitment to make it the requirements sole-source. In March 1996, the FY 1996–2000 contracts were awarded to Lockheed Martin.

On June 25, 1996, Westinghouse submitted a certified claim to the Contracting Officer ("CO"). In its claim, Westinghouse sought compensation for damages resulting from the Navy's alleged breach of its alleged commitment to make Westinghouse the sole-source producer for the life of the SQQ–89 program. The CO's Final Decision denying the claim

was issued on November 22, 1996. Plaintiff filed its seven-count complaint on May 16, 1997, seeking damages for the alleged breach of its contract. On November 6, 1997, defendant filed its motion to dismiss for failure to state a claim upon which relief can be granted. The court heard oral argument on defendant's motion on April 15, 1998.

*Discussion*

I. *Failure to State a Claim*

The court will dismiss a complaint, pursuant to RCFC 12(b)(4), for failure to state a claim upon which relief may be granted only if it appears beyond a doubt that plaintiff has failed to allege facts sufficient to support its claim. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Mostowy v. United States,* 966 F.2d 668 (Fed.Cir.1992). In ruling on a RCFC 12(b)(4) motion to dismiss, the court must accept as true the complaint's undisputed factual allegations and should construe them in a light most favorable to plaintiff. *Papasan v. Allain,* 478 U.S. 265, 283, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986) (citing *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Gould, Inc. v. United States,* 935 F.2d 1271, 1274 (Fed.Cir.1991)). Nevertheless, "conclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss." *Briscoe v. LaHue,* 663 F.2d 713, 723 (7th Cir.1981), *aff'd,* 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983). "[L]egal conclusions, deductions, or opinions couched as factual allegations are not given a presumption of truthfulness." *Blaze Construction, Inc. v. United States,* 27 Fed.Cl. 646, 650–51 (1993) (quoting 2A JAMES WM. MOORE & JO DESHA LUCAS, MOORE'S FEDERAL PRACTICE, ¶ 12.07[2.–5] (2d ed.1992)); *Marshall v. United States,* 21 Cl.Ct. 497, 499 (1990) (quoting 2A J. MOORE, J. LUCAS, AND G. GROTHEER, JR. MOORE'S FEDERAL PRACTICE ¶ 12.07[2.–5] at 12–64 (2d ed.1990)); *see also* 2 JAMES WM. MOORE, MOORE'S FEDERAL PRACTICE § 12.34[1][b] at 12–60 (3d ed.1998) (quoting *Campbell v. San Antonio,* 43 F.3d 973, 975 (5th Cir.1995); *Blackburn v. City of*

---

**5.** By 1995, the GE business unit that had been involved with the SQQ–89 program had been acquired by Lockheed Martin.

**6.** The record does not indicate that an appeal was filed from that decision.

*Marshall,* 42 F.3d 925, 931 (5th Cir.1995)) ("[c]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss.").

Westinghouse's complaint is comprised of seven counts, one base claim for breach of the express terms of the contract (Count I) and six alternative grounds for finding on its behalf (Counts II–VII). Depending upon the asserted theory of damages, Westinghouse seeks alternative damages of $112,151,000 for a restitutionary recovery or $205,525,000 upon an expectational theory of recovery.

## II. Contract Theories of Recovery (Counts I & II)

It is undisputed that Section M of the solicitations was incorporated into the contracts awarded to Westinghouse. Westinghouse asserts this clause contractually requires the Navy to grant it sole-source status for the life of the program. By electing to compete the FY 1996–2000 contracts and subsequently awarding those contracts to Lockheed Martin, Westinghouse argues this contract clause was breached. Westinghouse argues it is entitled to either $112,151,000 in damages on a restitutionary basis or $205,-525,000 in damages on an expectational theory. Defendant responds that the statement upon which plaintiff relies does not even contain the phrase "sole-source," which it asserts is a term of art. Defendant also states that plaintiff's allegation is belied by the plain language of Section M.

 It is a well-established principle of contract interpretation that "the language of a contract must be given that meaning that would be derived from the contract by a reasonable intelligent person acquainted with the contemporaneous circumstances." *Hol–Gar Mfg. Corp. v. United States,* 169 Ct.Cl. 384, 351 F.2d 972, 975 (1965) (citations omitted). In interpreting the contract, the court seeks to "effectuate its spirit and purpose." *Gould, Inc. v. United States,* 935 F.2d 1271, 1274 (Fed.Cir.1991) (quoting *Arizona v. United States,* 216 Ct.Cl. 221, 575 F.2d 855, 863 (1978)). Additionally, in framing its question in the context of an inquiry designed to construe plaintiff's allegation in a light most favorable to it, "[t]he crucial ques-

tion is 'what [the contractor] would have understood as a reasonable … contractor,' not what the drafter of the contract terms subjectively intended." *Corbetta Constr. Co. v. United States,* 198 Ct.Cl. 712, 461 F.2d 1330, 1336 (1972) (citations omitted). Nonetheless, "[p]laintiff's interpretation must be within a 'zone of reasonableness.'" *Dana Corp. v. United States,* 200 Ct.Cl. 200, 470 F.2d 1032, 1043 (1972) (quoting *Bishop Engineering Co. v. United States,* 180 Ct.Cl. 411, 415–16, 1967 WL 9033 (1967)). "Generally, the plain language of a contract controls, and only language which is reasonably susceptible to more than one meaning may be considered ambiguous." *Thermal Electronic, Inc. v. United States,* 25 Cl.Ct. 671, 673 (1992) (citing *Neal & Co. v. United States,* 19 Cl.Ct. 463, 471 & n. 4 (1990), *aff'd,* 945 F.2d 385 (Fed.Cir.1991); *John C. Grimberg Co. v. United States,* 7 Cl.Ct. 452, 457, *aff'd,* 785 F.2d 325 (Fed.Cir.1985)). An ambiguity does not exist simply on the basis that the parties assert different interpretations of the contract. *Thermal Electronic,* 25 Cl.Ct. at 673. While "[a]ny group of words can be twisted by strained construction into an ambiguity … this should not be done." *Dana,* 470 F.2d at 1043 (citing *Aero Mayflower Transit Co. v. United States,* 162 Ct.Cl. 233, 237, 1963 WL 8494 (1963)). "When parties have deliberately put their engagements in writing, and such writing is complete on its face and is certain and definite as to the objects of their engagement, it is conclusively presumed that the whole contract of the parties and the extent and manner of their undertaking was reduced to writing, and cannot be contradicted, altered, added to or varied by parol or extrinsic evidence." *National Rural Utilities Cooperative Finance Corp. v. United States,* 14 Cl.Ct. 130, 136 (1988), *aff'd,* 867 F.2d 1393 (Fed.Cir.1989) (quoting 4 WILLISTON ON CONTRACTS, § 632A, at 985 (3d ed.1961)).

 Westinghouse's claim of breach of express contract terms is based upon Section M of the 1992 solicitations which was incorporated into the FY 1992–1995 contracts. Section M reads: "This competition will result in a downselect decision. The successful offeror will become the sole producer, system engineering and design agent for the AN/

SQQ–89(V) program." The "contemporaneous circumstances" at the time the solicitations were released were the award of two contracts for FY 1992–1995. While Section M does state that the successful offeror will become the sole producer for the program, it does not state that that offeror will become the sole producer, let alone sole-source, *for the life of the program.* Section M, by its terms, in no way contradicts the solicitations, which were seeking a contract of no more than four years. "The subjective intent of one of the parties, if contrary to the unambiguous and reasonable text of the written contract, is not a basis for reforming the contract." *City of Oxnard v. United States,* 851 F.2d 344, 347 (Fed.Cir.1988). Westinghouse's interpretation cannot stand. Section M was incorporated into the contracts, and these contracts were of a specific duration: for fiscal years 1992–1995. Thus, Section M must be viewed as a component of a four-year contract, not as superseding the four-year duration. Nothing in the plain terms of Section M suggests an indefinite contract duration lasting for the life of the program.[7]

Therefore, plaintiff has failed to state facts sufficient to support its claim, and as to Count I, the court will dismiss plaintiff's claim.

In Count II, Westinghouse argues that the alleged commitment by the Navy to make it the sole-source producer constituted an implied-in-fact contract. Westinghouse contends that there existed mutual assent by the parties that the winner of the 1992 competition would become the sole-source provider for future program requirements. Plaintiff argues that the Navy's representations concerning alleged sole-source status constituted an offer which was accepted by Westinghouse. The 1995 competition and later award to Lockheed Martin allegedly breached the alleged implied-in-fact contract. Westinghouse claims damages of either $112,151,000 under a restitutionary theory or $205,525,000 by an expectational theory. The government asserts no promise was ever made that the winner of the 1992 competition would receive sole-source status beyond the term of the contracts, and that the allegation of any such promise is belied by the plain language of the various statements upon which plaintiff alleges it has relied.

While defendant's statements promised that the winner of the competition will become the "sole producer" for the program, none guarantees sole-source status of an indefinite duration. The "offer" made by the government was done so within the context of a four-year fixed-term procurement. Plaintiff argues that "it is not a time-limited promise."[8] Plaintiff further elaborates that this language "does not make any reference to a contract term or specific requirements. It says 'for the program.' "[9] Despite plaintiff's entreaties, the clause "for the AN/SQQ–89 program" promises nothing beyond the proposed four-year term of this particular procurement. The clause does *not* read "for *the life of* the AN/SQQ–89 program." In view of the fact that these statements were made within the context of a fixed-term procurement, a fact known to plaintiff, the court will not read into these statements a durational extension beyond the proposed term in the solicitation and the fixed-term of the eventual contract.

Plaintiff argues that the language of the CJ & A demonstrates that the Navy shared its interpretation of these statements. The CJ & A reads: "As a result of the downselect decision, the Navy plans sole-source procurements with the successful offeror beginning in FY96." It also states: "The successful

7. To the extent that plaintiff relies upon *Federal Trade Commission v. Alliant Techsystems Inc.,* 808 F.Supp. 9 (D.D.C.1992), that case citation is unpersuasive for two reasons. First, the purported definition of "downselect" is discussed within the context of that Army ammunitions procurement. *Id.* at 15. That analysis, however, relates merely to the circumstances of that procurement. "Following *this* downselect, the Army no longer would hold competitive bids for 120mm ammunition, but would sole source the munitions from a single supplier." *Id.* at 15

(emphasis added). It provides no support for any proposition that use of the word "downselect" converts a fixed-term contract into an indefinite one. Second, as a U.S. District Court opinion, it would not bind this court to the proposition advanced by plaintiff.

8. Transcript (Tr.) at 29.

9. *Id.* at 30.

offeror for the production requirements will become the sole producer, system engineering and design agent contractor for the AN/SQQ–89(V) program." Plaintiff cites *Blinderman Constr. Co. v. United States,* 695 F.2d 552, 558 (Fed.Cir.1982), for the proposition that "[i]t is a familiar principle of contract law that the parties' contemporaneous construction of an agreement, before it has become the subject of a dispute, is entitled to great weight in its interpretation." *Id.* Also, "an implied-in-fact contract is one 'founded upon a meeting of the minds, which . . . is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding.'" *Atlas Corp. v. United States,* 895 F.2d 745, 754 (Fed.Cir.1990), *cert. denied,* 498 U.S. 811, 111 S.Ct. 46, 112 L.Ed.2d 22 (1990) (citing *Porter v. United States,* 204 Ct.Cl. 355, 496 F.2d 583, 590 (1974), *cert. denied,* 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 761 (1975) quoting *Baltimore & O.R.R. v. United States,* 261 U.S. 592, 597, 43 S.Ct. 425, 67 L.Ed. 816 (1923)). Even if the first cited clause stands for the proposition plaintiff advances, plaintiff has not demonstrated it possessed knowledge of the CJ & A. Since plaintiff has not demonstrated that it had knowledge of the contents of the CJ & A before submitting its bid, plaintiff cannot argue there was a "meeting of the minds" or "tacit understanding" with regard to post-FY 1995 procurements. Therefore, there could not have existed a contemporaneous agreement to make plaintiff the sole-source producer of contract requirements beyond the duration of the fixed-term contracts between the parties. With regard to the second statement, plaintiff has failed to demonstrate that the Navy manifested any intent that "for the AN/SQQ–89(V) program" implies a term beyond the terms of the solicitation and the contract. Without more, plaintiff has failed to state facts sufficient to support its claim as

to Count II; thus, Count II will be dismissed.

Additionally, plaintiff's argument that defendant was bound by its interpretation of these statements fails. By Westinghouse's own words, it never told the Navy it assumed the competition for a fixed-term four-year contract actually to be one for a program-life commitment. Westinghouse states it "repeatedly notified the Navy that it understood that it was competing to be the sole-source for the entire SQQ–89 program."[10] Westinghouse, however, never states, in so many words, that it informed the government that it was competing for the entire program beyond the duration of the proposed contracts. Therefore, these statements are not persuasive for the proposition that Westinghouse was competing for the entire program for an indefinite duration as opposed to the four-year term solicited by the government.

### III. *Theories of Recovery Based Upon Mutual Mistake (Counts III & IV)*

In Count III, Westinghouse argues it is entitled to contract reformation because of mutual mistake as to basic assumptions. Westinghouse contends it and the Navy shared two basic assumptions: (1) Westinghouse's only competitor did not possess the ability to sustain production capabilities for any requirements as of 1996 and beyond; and (2) Westinghouse achieved sole-source status. Further, Westinghouse claims it did not assume the risk for these mistakes, as the Navy allegedly was in a better position to evaluate GE/Lockheed Martin's ability to compete in the future as well as whether or not Westinghouse in fact attained sole-source status. Westinghouse asserts these mistakes had a material effect on the bargain such that it would not have submitted as low of a bid as it otherwise did. As a result, Westinghouse seeks a contract reformation that would increase the price of the 1992 con-

---

10. Compl. at ¶ 22. At oral argument, counsel for Westinghouse stated, "During negotiations Westinghouse repeatedly notified the Government it was competing for the entire program." Tr. at 37. Plaintiff also argued, "Westinghouse came in and said our bid is deliberately aggressive to ensure Westinghouse is the supplier of the systems for the nineties and beyond." *Id.* at 37. Plaintiff, in its brief and at oral argument, never

alleged it informed the government its bid was submitted with the understanding, or was valid only under such circumstances, that this competition involved a commitment that would exceed the fixed duration of the proposed contract. If plaintiff desired its bid to be considered under such circumstances, plaintiff's own statements provide no notice for what it now argues was its intent regarding treatment of its bid.

tracts by \$112,151,000. The government responds that plaintiff's claim that the government promised to make it the sole-source for the life of the program is without merit. Defendant also argues any miscalculation by the parties concerning Lockheed Martin's ability to compete for the FY 1996–2000 contracts was merely an incorrect prediction regarding the future, such that the mistake doctrine does not apply.

■ The elements of a mutual mistake are: (1) the parties to a contract were mistaken in their belief regarding a fact; (2) the mistake constitutes a basic assumption underlying the contract; (3) the mistake had a material effect on the bargain; and (4) the contract did not put the risk of the mistake on the party alleging mistake. *Dairyland Power Cooperative v. United States,* 16 F.3d 1197, 1202 (Fed.Cir.1994); *Atlas,* 895 F.2d at 750; *National Presto Indus., Inc. v. United States,* 167 Ct.Cl. 749, 338 F.2d 99, 107–09 (1964), *cert. denied,* 380 U.S. 962, 85 S.Ct. 1105, 14 L.Ed.2d 153 (1965). Westinghouse can neither demonstrate the credibility of these basic assumptions for the proposition it forwards nor the *mutual* character of any mistake with regard to them.

■ "To establish a mutual mistake of fact … the party seeking reformation must show that the parties to the contract held an erroneous belief as to an existing fact." *Dairyland,* 16 F.3d at 1202 (citation omitted). Furthermore, "there is uniformity among the circuit courts of appeals and the commentators that mutual mistake of fact cannot lie against a future event." *Id.* at 1203. West-

inghouse first argues that both parties were mistaken as to GE's ability to sustain the necessary production capacity to compete for the next contract, which would be bid in FY 1996. The apparent basis for the assertion of mutuality, however, is the statement in the CJ & A in which the Navy internally planned to sole-source future procurements with the winner of the 1992 competition, not yet Westinghouse at the time the CJ & A was executed.[11] The portion of the CJ & A cited by plaintiff, however, only states that the Navy planned sole-source procurements, as of FY 1996, with the winner of the 1992 competition. Regardless of the expectation that the loser of the 1992 competition would likely drop out of the field, this CJ & A statement, by its terms, makes no conclusion concerning the capability of the loser to compete for future contracts. Additionally, plaintiff failed to allege it possessed knowledge of this document at the time of contract formation. Plaintiff's failure to assert it knew of the CJ & A eliminates any credible allegation of an agreement on this point. Thus, there is no indication of an agreement relating to future procurements or future competition that was incorporated into the bargain.

Even if this "mistake" was mutual, it was as to a future event, and plaintiff's claim must fail. Westinghouse cites *Atlas* for the proposition that "even though the outcome of a fact is unknowable, the parties can make a mistake concerning that fact. But where the existence of a fact is unknowable, the parties cannot have a belief concerning that fact, and they cannot make a mistake about it." *Atlas,* 895 F.2d at 751.[12] This is precisely the point.

11. Westinghouse asserts that the government, in its motion to dismiss, admitted that "both parties believed that the loser of the competition would not be able to participate in later SQQ–89 procurements." Brief in Opposition to Defendant's Motion to Dismiss (Pl.'s. Opp.) at 20. In fact, defendant's motion states that the parties expected the 1992 competition loser would not compete for later procurements. Defendant's Motion to Dismiss at 11. Defendant's statement offers no commentary on the loser's future *capability* to compete.

12. It should be noted that while plaintiff cites *Atlas Corp. v. United States,* 895 F.2d 745 (Fed. Cir.1990), *cert. denied,* 498 U.S. 811, 111 S.Ct. 46, 112 L.Ed.2d 22 (1990), for support of its position, the United States Court of Appeals for

the Federal Circuit, in that case, held those plaintiffs' allegations insufficient because of a failure to allege a mistake that would support reformation. *Id.* at 750. The Federal Circuit elaborated that "the plaintiffs' allegations of their 'mistake' do not show that they held an erroneous belief concerning a fact whose existence the parties could recognize and about which they could negotiate agreement." *Id.* at 752. In the present case, the parties could not have known whether GE would compete in 1996. The fact that both parties anticipated the loser of the 1992 competition, GE, would drop out of the business is immaterial. The winner of 1992 competition was presented no promise of automatic future procurements. Westinghouse's aggressive bid was simply the cost of doing business and was part of its attempt to win the contract. Westing-

"The purpose of reforming a contract on the basis of mutual mistake is to make a defective writing conform to the agreement of the parties upon which there was a meeting of the minds." *Emerald Maintenance, Inc. v. United States*, 925 F.2d 1425, 1429 (Fed.Cir. 1991) (citing *American President Lines, Ltd. v. United States*, 821 F.2d 1571, 1582 (Fed. Cir.1987)). There was no agreement concerning whether or not GE would provide viable competition for FY 1996; this matter concerned an unknowable fact, and the parties could not have made a mutual mistake about it. "A party's prediction or judgment as to events to occur in the future, even if erroneous, is not a 'mistake' as that word is defined [under the doctrine of mutual mistake of fact.]" *Dairyland*, 16 F.3d at 1203 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 151 cmt. a (1981)). The question of future competition has not been alleged to have been an express element of these contracts. Therefore, the fact that events failed to evolve as the parties predicted does not constitute a mutual mistake of fact. Accordingly, plaintiff's contention regarding this first alleged basic assumption fails the first prong of the test for mutual mistake.

The second basic assumption posited by plaintiff is that plaintiff attained sole-source status for the entire program. The Navy admitted that it believed this to be true respecting the duration of the contract, but not for the life of the program. Plaintiff has failed to allege sufficient facts suggesting the Navy shared or acquiesced to plaintiff's erroneous view regarding sole-source status. Therefore, the "mistake" cannot be considered a mutual mistake, and Count III will be dismissed.

▪ In Count IV, Westinghouse seeks reformation of the contracts due to an alleged mutual mistake in integration. Westinghouse argues that at the time of contracting, both parties believed that the attainment of sole-source status by the winner of the FY 1992–1995 contract competition was incorporated into the contracts. If this alleged commitment by the Navy was not incorporated into those contracts, Westinghouse claims there existed a mutual mistake as to integration. Thus, Westinghouse requests reformation of the contracts to include this alleged commitment, which would place the Navy in breach for having competed and subsequently awarded the SQQ–89 program requirements contracts to Lockheed Martin. Under this theory of damages, Westinghouse claims it is entitled to either $205,525,000 for expectational recovery or $112,151,000 for restitutionary recovery.

Westinghouse has failed to demonstrate the existence of this commitment, let alone its integration into the contracts. The Navy acknowledges it considered Westinghouse the "sole-source" producer for the FY 1992–1995 contracts. Westinghouse, however, has not presented sufficient evidence to support its thesis that the parties incorporated into their fixed-term four-year contract a commitment that Westinghouse would remain the sole-source producer beyond the life of the contracts. Thus, without the requisite meeting of the minds, there could have been no mutual mistake. Accordingly, Count IV will be dismissed.

## IV. *Equitable Estoppel Theory of Recovery (Count V)*

In Count V, Westinghouse argues the Navy is estopped from denying its alleged commitment of sole-source status for Westinghouse beyond the stated terms of the contracts. As the Navy allegedly represented consistently that the winner of the 1992 contracts competition would become the program's sole producer, Westinghouse contends its reliance on these alleged commitments was reasonable and detrimental such that the Navy is estopped from denying them. Due to the 1995 competition and later award to Lockheed Martin of the FY 1996–2000 contracts, Westinghouse asserts this alleged commitment was breached entitling it to either $205,525,000 in expectation damages or

house's successful bid allowed it to receive the FY 1992–1995 contracts, and assuredly an advantageous position regarding future procurements. Receipt of the FY 1992–1995 contracts did not grant a right to, or even an understanding that it would receive, future contracts in perpetuity. That Westinghouse's prediction proved incorrect does not give rise to a cause of action against the United States.

$112,151,000 in restitutionary damages. Defendant retorts that the alleged commitment plaintiff seeks to estop the Navy from denying is belied by the plain language of the contracts. Further, defendant argues this count should be dismissed because: (1) collateral estoppel bars re-litigation of this theory which was rejected in the 1995 district court case between the parties; (2) equitable estoppel cannot be applied against the United States here; and (3) plaintiff cannot establish detrimental reliance to prove equitable estoppel.

On the issue of collateral estoppel, the United States District Court for the Western District of Pennsylvania, in assessing Westinghouse's claim, summarized plaintiff's argument as follows:

> Westinghouse ... contends that the Secretary made certain statements at the time of the down select competition that were justifiably understood by Westinghouse as indicating that the winner of the competition would be awarded all future contracts for this system on a non-competitive sole-source basis. According to Westinghouse, because it relied on these statements to its detriment, the Secretary is now equitably estopped from awarding the contract on any other basis.

*Westinghouse*, 894 F.Supp. at 206. In the complaint before this court, Westinghouse asserts that

> the Navy is estopped from denying its commitment of sole-source status.... The Navy consistently and frequently represented that the successful offeror in the 1992 competition would become the sole producer for the SQQ-89 program.... Westinghouse reasonably relied on the representation of the Navy regarding the sole-source status of the successful offeror. Such reliance was to the detriment of Westinghouse.... Because of the detrimental reliance of Westinghouse on the sole-source representations of the Navy, the Navy is estopped from denying its commitment.[13]

▮▮▮▮ The United States Court of Appeals for the Federal Circuit has noted the

factors which justify application of collateral estoppel: (1) the issue to be decided is identical to the one decided in the first action; (2) the issue was actually litigated in the first action; (3) resolution of the issue was essential to a final judgment in the first action; and (4) the parties had a full and fair opportunity to litigate the issue in the first action. *Arkla, Inc. v. United States,* 37 F.3d 621, 624 (Fed.Cir.1994), *cert. denied,* 514 U.S. 1035, 115 S.Ct. 1399, 131 L.Ed.2d 287 (1995) (citing *Mother's Restaurant, Inc. v. Mama's Pizza, Inc.,* 723 F.2d 1566, 1569 (Fed.Cir.1983)). Plaintiff advances the same equitable estoppel theory in the present case that it advocated, and upon which it lost, in district court. Upon review of that district court decision, the court is satisfied that the aforementioned conditions for application of collateral estoppel have been met, and plaintiff is collaterally estopped from pursuing this theory a second time.

It is, however, true that Westinghouse now makes its arguments in a different context. In 1995, plaintiff sought to prevent a competition by arguing the government breached its alleged commitment, while Westinghouse now seeks damages that allegedly resulted from the alleged breach. Nevertheless, assuming *arguendo* that Westinghouse could avoid collateral estoppel application, its equitable estoppel claim must be dismissed anyway.

The Supreme Court addressed the issue of equitable estoppel claims against the government in *Office of Personnel Management v. Richmond,* 496 U.S. 414, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990). Since the circumstances of the that case allowed the Court to reach a narrow ground of decision, it stated that "we need not embrace a rule that no estoppel will lie against the Government in any case...." *Id.* at 423, 110 S.Ct. 2465.

The fact that the Supreme Court declined to issue a broad ruling that no estoppel claims will lie against the government is only part of the story. The Court, at several instances in the *Richmond* decision, is quick to note it is not opening the door for the filing of estoppel cases against the govern-

---

**13.** Compl. at ¶¶ 58–61.

ment. In addressing the equitable estoppel argument, the Court acknowledged that its opinions "have continued to mention the possibility, in the course of rejecting estoppel arguments, that some type of 'affirmative misconduct' might give rise to estoppel against the Government." *Id.* at 421, 110 S.Ct. 2465. In allowing that affirmative misconduct may provide a viable means for an estoppel claim, the Court stated that "Courts of Appeals have taken our statements as an invitation to search for an appropriate case in which to apply estoppel against the Government, yet we have reversed every finding of estoppel that we have reviewed." *Id.* at 422, 110 S.Ct. 2465. The Court also wrote, "Even our recent cases evince a most strict approach to estoppel claims involving public funds.... Opinions have differed on whether this Court has ever accepted an estoppel claim in other contexts ... but not a single case has upheld an estoppel claim against the Government for the payment of money." *Id.* at 426–427, 110 S.Ct. 2465. Therefore, the Court may. not have closed the door entirely on estoppel claims against the government, but it is apparent that an allegation of affirmative misconduct is a likely prerequisite.

Plaintiff correctly notes that the estoppel holding of the *Richmond* case was narrowly crafted to the matter of "a claim for payment of money from the Public Treasury contrary to a statutory appropriation." *Id.* at 424, 110 S.Ct. 2465. In *Burnside–Ott Aviation Training Center, Inc. v. United States*, 985 F.2d 1574 (Fed.Cir.1993), the Federal Circuit pronounced that *Richmond's* holding "must be limited to claims of entitlement contrary to statutory appropriations." *Id.* at 1581. This court, however, disagrees with plaintiff's contention that *Burnside–Ott* somehow negates the relevance of *Richmond* to this case. The Federal Circuit stated that *Richmond's* holding was not so broad such that "equitable estoppel will not lie against the government for any monetary claim." *Burnside–Ott*, 985 F.2d at 1581. This reasoning is consistent with *Richmond* because the Supreme Court explicitly refused to issue a blanket ban on estoppel claims against the government. Additionally, *Burnside–Ott* does not contradict the Supreme Court's caveat against pursuing estoppel claims.

In finding *Richmond* inapplicable to that case, the Federal Circuit distinguished *Burnside–Ott* on the grounds that Burnside–Ott's claim was not based on a statutory entitlement, but rather was grounded in a contract with the Navy. At first blush, these facts parallel those of the present case. That decision, however, must be viewed in the context of the circumstances of the *Burnside–Ott* decision. The Federal Circuit found that this court "improperly relied on *Richmond* to conclude that Burnside–Ott's equitable estoppel claim is barred as a matter of law." *Burnside–Ott*, 985 F.2d at 1581. The Federal Circuit overturned this court's grant of summary judgment to the government because the "equitable estoppel claim is not barred as a matter of law because of *Richmond*. Equitable estoppel may or may not apply in this case depending on facts yet to be established." *Id.* at 1581. Thus, the Federal Circuit did not open the door wide for entertaining estoppel claims against the government, but rather acknowledged that estoppel claims are not automatically barred. Taken in context with the Supreme Court's pronouncements in *Richmond,* two things are clear: (1) affirmative misconduct is a virtual prerequisite for pressing any estoppel claim against the government; and (2) the reluctance of the Court to issue a broad ban is not to be read as an invitation or relaxation on the estoppel issue because the Court notes it has overturned every instance of estoppel it has reviewed. Therefore, *Richmond* stands as an affirmation of the idea that lower courts should exercise the utmost caution in dealing with any inclination to grant equitable estoppel claims against the government. In issuing its decision in *Burnside–Ott,* the Federal Circuit did not upset its earlier, post-*Richmond* ruling in *JANA, Inc. v. United States,* 936 F.2d 1265 (Fed.Cir. 1991). *Burnside–Ott* may be read to answer the implied question in *JANA* that "it is ... not entirely clear whether the defense of estoppel is still available against the government in light of ... *Richmond."* *JANA,* 936 F.2d at 1270. *Burnside–Ott* answered that question affirmatively, but that answer must take into account the cautionary statements of *Richmond.* In *JANA,* the Federal Circuit

addressed the status of its precedent relating to estoppel claims against the government based upon a contract. *Burnside–Ott* does not contradict, or repudiate, *JANA's* aspiration that the Federal Circuit's pre-*Richmond* contract precedent may still be valid. In *JANA,* the Federal Circuit stated that "even if our contract precedent prior to *Richmond* is still valid, it is clear that the requirements of estoppel were not shown here." *JANA,* 936 F.2d at 1270. In light of *Burnside–Ott's* failure to repudiate this assumption of *JANA,* the court addresses the present contract claim under that standard and, as in *JANA,* finds the requirements of estoppel lacking.

 *JANA* stated that the necessary elements for asserting an estoppel claim against the government in a contract context are: (1) the government must know the true facts; (2) the government must intend that its conduct be acted on or must so act that the contractor asserting the estoppel has a right to believe it so intended; (3) the contractor must be ignorant of the true facts; and (4) the contractor must rely on the government's conduct to his injury.[14] *JANA,* 936 F.2d at 1270 (citing *American Electronic Laboratories, Inc. v. United States,* 774 F.2d 1110, 1113 (Fed.Cir.1985)); *see also Advanced Materials, Inc. v. Perry,* 108 F.3d 307, 311–12 (Fed.Cir.1997). The issue of detrimental reliance alone causes plaintiff's equitable estoppel claim to fail.

 Westinghouse cites *Broad Ave. Laundry & Tailoring v. United States,* 231 Ct.Cl. 1, 681 F.2d 746 (1982), for the proposition that it reasonably relied on the alleged sole-source commitments by the Navy. *Broad Ave.,* however, involved a set of facts altogether different from this case. In *Broad Ave.,* the government was estopped from denying the blunders of a contracting officer, who upon inquiry from a sole-proprietor contractor without legal representation, misinterpreted the applicable law, eventually leading to a denial of a contractor claim submitted as it was because of the contrac-

tor's reliance on the contracting officer's mistake. In this case, Westinghouse, an undoubtedly large corporation assuredly with quality legal representation throughout the course of its 1992 bidding, presents no "facts" suggesting any action by a government official upon which it could have credibly relied for the proposition that the government promised to make it the sole-source for the life of the program. Thus, Count V will be dismissed.

## V. Theory of Recovery Even if Alleged Commitment Unenforceable (Count VI)

 In Count VI, Westinghouse asserts that if the government attempts to avoid the alleged commitment by arguing that either the alleged sole-source commitment was illegal or that the 1992 contracts, in their entirety, are unenforceable, then it is entitled to recovery under the theories of quantum meruit and quantum valebat, reformation and/or unjust enrichment in the amount of $112,-151,000 plus the costs of performance and reasonable profit. This count essentially involves plaintiff's assertion of reasonable detrimental reliance concerning defendant's alleged commitment to make plaintiff the sole-source producer for the life of the program. Defendant argues, as Westinghouse correctly anticipates, that any such commitment would have been in violation of the Competition in Contracting Act ("CICA"), 10 U.S.C. §§ 2304 *et seq.* (1994). Plaintiff states its reliance on this alleged commitment would have been nonetheless reasonable because there was no "palpable illegality."

Considering that it has been established that plaintiff's assertion that defendant allegedly committed itself to making plaintiff the sole-source producer for an indefinite duration was unreasonable in and of itself, addressing any issue of "palpable illegality" with regard to CICA is unnecessary. Plaintiff simply cannot demonstrate the reasonableness of its belief.[15] Count VI will be dismissed.

---

**14.** In light of *Richmond,* it is entirely probable that affirmative misconduct may also be a required element of an equitable estoppel claim against the government. No allegation of affir-

mative misconduct has been made in the present case.

**15.** It should be noted that CICA states that an agency head conducting procurement *"shall* ob-

## VI. *Theory of Recovery Based Upon a Taking (Count VII)*

 In Count VII, Westinghouse contends that it possessed a contractual right to be the sole-source for the program, and that right was a property interest taken by the government by the 1995 competition. As a result, Westinghouse claims it is entitled to just compensation for this alleged taking totaling $205,525,000. Defendant contends this claim should be dismissed on the ground that interference with contractual rights gives rise to a contract, rather than a takings, claim.

"[T]he Fifth Amendment requires compensation for losses due to government action only where there has been a 'taking' of 'property' for public use." *Atlas*, 895 F.2d at 756. Although the Supreme Court has developed no set formula for determining the existence of a taking of property there exist three significant factors:

> (1) the character of the government action; (2) the economic impact of the regulation on the plaintiff; and (3) the extent to which the regulation has interfered with distinct investment-backed expectations.

*Id.*, 895 F.2d at 757 (citing *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 224–25, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986)). Concerning the first factor, plaintiff failed to allege sufficient facts for the proposition that any property right was taken. In short, its four-year contract was fulfilled by both parties, and the court does not find that there existed any commitment to have actually created an indefinite contract at the time of formation. Regarding the second and third factors, the court finds that Westinghouse received that for which it bargained: the benefits of a four-year contract. In view of the fact that plaintiff has failed to present sufficient evidence that it possessed a right

to be the sole-source producer for the program beyond the term of the contract, defendant could not have "taken" what plaintiff did not possess in right or in fact. Count VII will be dismissed.

### Conclusion

For the above reasons, plaintiff has failed to withstand defendant's motion. The "facts" alleged by plaintiff for the purpose of avoiding dismissal of its complaint are more accurately characterized as conclusory allegations and legal conclusions. While the court must accept and construe factual allegations in a light most favorable to plaintiff, the court does not grant such favorable treatment to legal conclusions unsupported by facts.

Defendant's motion to dismiss plaintiff's complaint for failure to state a claim upon which relief can be granted is ALLOWED. The Clerk is directed to dismiss plaintiff's complaint. No costs.

tain full and open competition through the use of competitive procedures" and *"shall* use the competitive procedure ... best suited under the circumstances...." 10 U.S.C. §§ 2304(a)(1)(A), (B) (1994) (emphasis added). Also, an agency head, upon the satisfaction of one of seven exemptions *"may* use procedures other than competitive procedures...." 10 U.S.C. § 2304(c) (emphasis added). Thus, while non-competitive procedures may be employed by the agency head, the general principle regarding full and

open competition is mandatory in the process. While exempting findings may have been made, plaintiff itself states "[f]our of these exemptions would have permitted the Government to make a non-competitive award to [p]laintiff for future SQQ–89 requirements." Pl.'s Opp. at 31. Plaintiff, however, has not alleged these findings were made. Thus, the mandatory and overarching principle of full and open competition remains in place.